## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                                          No. CR 15-4299 JB

GRANT HYKES,

      Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Motion for Information Pursuant to *Giglio v. United States*[1] Regarding All Arresting Officers and Those Involved in the Search, filed February 29, 2016 (Doc. 25)("Giglio Motion").  The Court held a hearing on March 31, 2016.  The primary issue is whether the Court should require Plaintiff United States of America to disclose impeachment information inside the personnel files of three Bernalillo County New Mexico Sheriff's Office ("BCSO") officers who will testify at Defendant Grant Hykes' suppression hearing.  Given that the United States has access to the personnel files,  the United States must review the personnel files of the three officers who will testify at trial and determine whether any material constitutes exculpatory evidence under Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), or impeachment evidence under Giglio v. United States, 405 U.S. 150 (1972)("Giglio").

---

[1]In Giglio v. United States, 405 U.S. 150 (1972)("Giglio"), the Supreme Court of the United States of America held that prosecutors must disclose evidence that impeaches the credibility of government witnesses.  Giglio, 405 U.S. at 154-55.  Giglio extended the Supreme Court's holding in Brady v. Maryland, 373 U.S. 83 (1963)("Brady"), where the Supreme Court held that prosecutors must disclose all favorable material evidence to the defense.  Brady, 373 U.S. at 93.

## FACTUAL BACKGROUND

On November 12, 2015, detectives in Bernalillo County were investigating a reported death threat against Detective Gerald Koppman near the area of Pennsylvania Street and Menaul Boulevard NE in Albuquerque, New Mexico.  See Complaint at 3; Government Response to Defendant's Motion for *Giglio* Information (Doc. 25) at 1, filed March 14, 2016 (Doc. 29)("Response").  A confidential informant gave Koppman reason to believe that Hykes made the death threats against him.  See Complaint at 3.  Notably, however, Hykes asserts that Koppman "did not tell his superiors about those threats because [the information] came from an informant that he did not believe and whom he was investigating for a murder."  Reply to Government's Response to Mr. Hykes Motion to Suppress Evidence Due to Violation of the Fourth Amendment at 2, filed March 25, 2016 (Doc. 32)("Motion to Suppress Reply").  As detectives watched Hykes in a parking lot, the United States contends that Hykes reached into his waistband and pulled out a firearm before stashing the firearm in the truck bed.[2]  See Response at 1; Transcript of Hearing (taken March 31, 2016).[3]  Hykes disputes that he grabbed a gun or even that he reached into his waistband.  Instead, he argues that he reached with both hands into the

---

[2]Initially, the United States asserted that Hykes' actions were "consistent with either someone hiding or retrieving a firearm."  Tr. at 16:20-24 (Hurtado).  Neither the Response nor the Complaint stated that the detectives saw Hykes pull out a firearm before they approached him.  Nevertheless, at the hearing, the United States informed the Court that it spoke with the deputies about the case, and they indicated "that they actually saw the firearm in the defendant's hand before they even made their approach."  Tr. at 17:3-7 (Hurtado).  Accordingly, the United States "dispense[d] with its initial argument that the officers had reasonable suspicion," and "now seeks to elevate the argument from one involving reasonable suspicion to actual probable cause."  Tr. at 17:8-18 (Hurtado).  Hykes noted that Koppman did not say that he saw Hykes holding a firearm until March, even though the arrest occurred in November.  See Tr. at 18:15-20 (Baiz).

[3]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

bed of his silver Ford F-150 pick-up truck to get a new shirt.  See Complaint at 3; Motion to Suppress at 3.

The detectives then attempted to detain Hykes.  See Response at 1.  Although the United States asserts that Hykes resisted detention, Hykes explains that the detectives apprehended him by throwing him to the ground, kneeing him in the back, delivering several blows to his back while he was down, and kicking him in the head, while yelling "this is personal."  Motion to Suppress Evidence Due to Violation of the Fourth Amendment at 4, filed February 29, 2016 (Doc. 24)("Motion to Suppress").  Detectives observed a silver Smith and Wesson model 659, 9mm semi-automatic pistol with serial number TAL8284 (the "firearm") in the truck bed where Hykes reached.  Complaint at 3.  The United States alleges that this firearm was visible in plain sight.  See Response at 1-2.  As the detectives had previously determined that Hykes was a convicted felon, they advised him that he was under arrest for possessing the firearm.  See Complaint at 3.  Hykes' prior felony convictions include: (i) aggravated assault with a deadly weapon in D-202-CR-200300417 (1st Jud. Dist., State of New Mexico); (ii) receiving stolen property in D-202-CR-200401389 (1st Jud. Dist., State of New Mexico); and (iii) possession of a controlled substance in D-202-CR-200402605 (1st Jud. Dist., State of New Mexico).  See Indictment at 1, filed December 2, 2015 (Doc. 14).

While searching Hykes incident to arrest, detectives located an empty holster inside his waistband and a spare magazine.  See Complaint at 3; Response at 2.  The holster contained a spare loaded magazine designed for use in the firearm that the officers found in the truck bed. See Complaint at 3; Response at 2.  The firearm also fit inside of Hykes' holster.  See Complaint at 3.  The firearm was loaded with fourteen rounds of Federal .40 caliber ammunition.  See

Complaint at 3; Response at 2.  The spare magazine attached to Hykes' holster was loaded with fourteen rounds of Federal .40 caliber ammunition.  See Complaint at 3; Response at 2.

Detectives advised Hykes of his rights, and Hykes stated that he understood his rights.  See Complaint at 3; Response at 2.  When the detectives asked Hykes about the firearm, he stated that he did not know it was in the truck bed.  See Complaint at 3; Response at 2.  When the detectives asked Hykes about the holster in his waistband, "he stated that it was not illegal to have the holster and that the magazine was not his and would not have his fingerprints on it."  Complaint at 3.  See Response at 2.  Officers subsequently found black gloves on the rail of the truck's bed and inside the truck's bed near the firearm.  See Complaint at 3.  Officers tested the firearm, and determined that it fired and functioned as designed.  See Complaint at 4.  The firearm and ammunition were not manufactured in the State of New Mexico, but were found in New Mexico, thereby affecting interstate commerce.  See Complaint at 4.

## PROCEDURAL BACKGROUND

On December 2, 2015, a grand jury indicted Hykes for knowingly possessing a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1).  See Indictment, filed December 2, 2015 (Doc. 14).  On December 9, 2015, the Court entered an Order requiring the United States to provide "all of the information to which defendant is entitled pursuant to Rule 16 of the Federal Rules of Criminal Procedure."  Order, filed December 9, 2015 (Doc. 18).  Specifically, the Order requires the United States to disclose all materials that Brady, Giglio, and the Jencks Act, 18 U.S.C. § 3500, require the government to disclose.  See Order at 4.

**1.      The Giglio Motion.**

Hykes has also filed a Motion to Suppress evidence.  See Motion to Suppress at 1.  He expects several of the arresting agents, "including Officers Gerald Koppman, A. Arias, Sgt. L. Funes, S. Cotton, J. Nance, B. Cooksey and Zachary J. Rominger," will testify at a hearing on

the Motion to Suppress.  Giglio Motion at 2.  He "requests this Court order the government to disclose certain pertinent information pertaining to the above-mentioned officer[s] as the information is relevant to impeachment."  Giglio Motion at 2.  Particularly, Hykes requests the following information:

- Documentation of any and all OPR[4] Investigations;

- Citizen complaints;

- Disciplinary write-ups, actions, and reports;

- Internal affairs investigations and reports;

- Performance evaluations;

- Reprimands for off-duty or on-duty conduct;

- All other material written or otherwise revealing specific acts of dishonesty or misconduct bearing on these officers' character for truthfulness as well as their propensity for engaging in unlawful activity going beyond the scope of their official duties.

See Giglio Motion at 2.

In his Giglio Motion, Hykes argues that the Supreme Court's Giglio decision requires the government to disclose evidence affecting a government witness' credibility.  See Giglio Motion at 3.  He states that he "has a good faith basis to believe that the internal personnel files of some o[r] all of these officers contain information that may potentially be properly used for impeachment."  Giglio Motion at 4.  Hykes asserts that "witnesses have revealed that the

---

[4]The Office of Professional Responsibility ("OPR") was established by the Attorney General to ensure that Department of Justice attorneys and law enforcement personnel perform their duties in accordance with the highest professional standards expected of the nation's principal law enforcement agency.  See Policies and Procedures, Department of Justice, https://www.justice.gov/opr/policies-and-procedures.  OPR has jurisdiction to investigate allegations of misconduct against Department law enforcement personnel that relate to allegations of attorney misconduct within the jurisdiction of OPR.  See Policies and Procedures, Department of Justice, https://www.justice.gov/opr/policies-and-procedures.

information relied upon by officers to arrest Mr. Hykes was false."  <u>Giglio</u> Motion at 4.  He contends that this false information led the arresting officers to arrest him, beat him, and search him without warrants.  <u>See Giglio</u> Motion at 4.  He states that, because the Court will determine whether Hykes' Motion to Suppress is well-founded, the officers' credibility is "of critical import for this Court's ultimate decision."  <u>Giglio</u> Motion at 4.  Hykes reasons that the officers' personnel files will reveal whether the officers are trustworthy.  <u>See Giglio</u> Motion at 4.  Hykes argues that credibility information is especially relevant in this case, where the only witnesses against him are police officers, so "anything that goes to their credibility is exculpatory and admissible."  <u>Giglio</u> Motion at 5.

Additionally, Hykes observed that the Court has cautioned the United States Attorney's office to honor its "open file" policy and not to just disclose to "criminal defendants only the bare minimum that the law requires and nothing more."  <u>Giglio</u> Motion at 6 (quoting <u>United States v. Rodella</u>, 2015, WL 711931 (D.N.M. Feb. 2, 2015)(Browning, J.)).  Hykes further observes that, when the scope of disclosure to defense counsel is uncertain, "errors are to be made in favor of disclosure."  <u>Giglio</u> Motion at 7.  He concludes that, because this information will reveal essential impeachment evidence, the United States must disclose it.  <u>See Giglio</u> Motion at 7-8.

### 2.    <u>The Response</u>.

The United States responded, arguing that "the defendant's motion pertaining to discovery is not necessary and essentially redundant of the Court's previous Discovery Order." Response at 4.  It argues that Hykes' <u>Giglio</u> Motion is premature.  <u>See</u> Response at 4.  It explains that <u>Giglio</u> concerns a defendant's right to effectively cross-examine prosecution witnesses at trial, while the United States has not yet decided who it will call as witnesses at trial or at the suppression hearing.  <u>See</u> Response at 4.  It asserts that, before the suppression hearing, it will

disclose any impeachment information that the Court's Order would require it to disclose as to those witnesses it plans to call at the suppression hearing.  <u>See</u> Response at 5.  The United States, thus, agrees that it must disclose material evidence that supports actual innocence before trial, but argues that it need not disclose this information "in advance of a suppression hearing unless the information is also potential impeachment of a person the government will call to testify at the suppression hearing."  Response at 5.

Next, the United States argues, Hykes does not identify specific information that might be material.  <u>See</u> Response at 11.  It concedes that, if there is specific exculpatory information that Hykes believes exists, he may petition the Court for its disclosure, but "only after a specific request for production has been denied by the opposing party."  Response at 11.  It asserts that no law "entitles a defendant to the sort of fishing expedition/carte blanche discovery that he seeks here."  Response at 5.

Furthermore, the United States argues, Hykes' "laundry list of items that he requests, to the extent it goes beyond what is required by *Brady*, *Giglio*, Rule 16, Rule 26.2 and the Jencks Act, [is] simply not subject to disclosure by the government."  Response at 5.  It explains that many of the items that Hykes requests either do not exist or are not within the United States' control.  <u>See</u> Response at 8, 10.  The United States argues that it need not produce what it does not have.  <u>See</u> Response at 8.  Further, it asserts, pursuant to precedent from the United States Courts of Appeals for the Fifth and Ninth Circuits, it need not produce documents within the state government's control when the federal government does not have control over those documents.  <u>See</u> Response at 9.  Finally, it states that "the government's review and determination is controlling unless the defense provides grounds to believe there is impeachment information in the items to which the defense seeks access."  Response at 6.  It contends that

Hykes must "make a particularized showing of what information he was seeking or how it would be material" rather than making broad discovery demands.  Response at 7.

### 3.    **The Hearing.**

Hykes did not file a reply.  The Court held a hearing on March 31, 2016.  The United States informed the Court that it intended to present three witnesses, all from the BCSO: Koppman, Detective Arnie Arias, and Sergeant Luis Funes.  See Tr. at 4:10-14 (Hurtado).  Hykes stated that he had received "partial information" on Koppman.  Tr. at 4:22-25 (Baiz, Court).

Hykes explained that, after only a simple Internet search, he found "at least" two excessive force cases filed against Koppman, and another excessive force case against Koppman and Funes together.  Tr. at 5:11-20 (Baiz).  He stated that the United States gave him no information regarding these cases.  See Tr. at 5:11-20 (Baiz).  In response, the United States argued that the material Hykes requests does not meet the materiality standard required for document production.  See Tr. at 11:5-10 (Hurtado).  It contended that the United States should not have to produce or examine the personnel files without "a particular showing of materiality." Tr. at 11:25-12:2 (Hurtado).

In determining whether the United States had access and control over the information that Hykes requests, the Court then asked the United States about its relationship with the BCSO. See Tr. at 5:21-25 (Court).  The Court described how the BCSO has been "pretty willing to share personnel files with the U.S. Attorney's office" in the past.  Tr. at 5:21-25 (Court).  The United States "concede[d] that this was a joint investigation between BCSO and ATF."  Tr. at 6:1-3 (Hurtado).  After the United States informed the Court that it had spoken to each officer testifying at the suppression hearing earlier in the week, the Court asked whether the United States would be able to review those officers' personnel files.  See Tr. at 6:13-24 (Court,

Hurtado).  The United States asserted that it would likely be able to review those files.  <u>See</u> Tr. at 6:25-7:1 (Hurtado).

Given the BCSO's participation in the investigation and the United States' relationship with BCSO, the Court suggested that the United States review the personnel files of the officers who will testify and conduct a <u>Brady</u> and <u>Giglio</u> review.  <u>See</u> Tr. at 7:2-18 (Court).  The Court directed the United States to make specific requests to view citizen complaints, disciplinary actions, and other items that Hykes seeks instead of asking for all relevant information.  <u>See</u> Tr. at 8:17-25 (Court).  The Court then instructed the United States to make a personal determination whether the information is <u>Brady</u> or <u>Giglio</u> material.  <u>See</u> Tr. at 8:17-25 (Court).  The Court asked Hykes if such a review would satisfy his needs in the <u>Giglio</u> Motion.  <u>See</u> Tr. at 9:1-2 (Court).  Hykes responded that such a review would satisfy his needs.  <u>See</u> Tr. at 9:3-6 (Baiz)("[I]f he sits down and looks at the personnel files and sees if any of the items that as you mentioned there is citizen's complaints, reports that they are not following the rules or doing their job.").  He asked whether he could give the United States the names of the cases against Koppman and Funes.  <u>See</u> Tr. at 9:3-6 (Baiz).  The Court directed Hykes to send a letter to the United States with the case names and "as much information as you can so that he can trigger the officers' memory."  Tr. at 9:11-15 (Court).

At the end of the hearing, the United States explained that the United States Attorney's Office does not have an open-file policy.  <u>See</u> Tr. at 12:7-15 (Hurtado)("I want to affirm clearly in open Court and on the record that there is no open file policy that the U.S. Department of Justice or the U.S. Attorney's office follows either in this district or across the entire United States.").  The United States asserted that it still believes that the United States does not have to search personnel files unless Hykes demonstrates that the information is material, but stated that

- 9 -

it "understand[s] the court's reasoning and the Government respects the court's decision." Tr. at 13:4-7 (Hurtado). The Court clarified that it is not ordering production of the personnel files before the suppression hearing. It simply directs the United States to examine the files, to determine whether any <u>Giglio</u> or <u>Brady</u> material exists, and to produce any such material before trial. <u>See</u> Tr. at 13:14-23 (Court).

## <u>LAW REGARDING RULE 16</u>

Rule 16(a)(1)(E) of the Federal Rules of Criminal Procedure provides:

**(E)** **Documents and Objects.** Upon a defendant's request, the government must permit the defendant to inspect and to copy or photograph books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:

   **(i)**   the item is material to preparing the defense;

   **(ii)**   the government intends to use the item it its case-in-chief at trial; or

   **(iii)**   the item was obtained from or belongs to the defendant.

Fed. R. Crim. P. 16(a)(1)(E). Although rule 16's language is permissive, it does not authorize "a blanket request to see the prosecution's file," and a defendant may not use the rule to engage in a "fishing expedition." <u>United States v. Maranzino</u>, 860 F.2d 981, 985-86 (10th Cir. 1988)(citing <u>Jencks v. United States</u>, 353 U.S. at 667). Rule 16 also does not obligate the United States to "take action to discover information which it does not possess." <u>United States v. Badonie</u>, No. CR 03-2062 JB, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.)(quoting <u>United States v. Tierney</u>, 947 F.2d 854, 864 (8th Cir. 1991))(internal quotation marks omitted); <u>United States v. Rodella</u>, 2015 WL 711931, at *14 (D.N.M. Feb. 2, 2015)(Browning, J.). Nor is the United States required to secure information from third parties. <u>See</u> <u>United States v. Gatto</u>, 763 F.2d 1040, 1048 (9th Cir. 1985)(holding that rule 16 does not contain a due diligence element

requiring a prosecutor to search for evidence not within the United States' possession, custody, or control).

Evidence is "material" under rule 16 if "there is a strong indication that it will play an important role in uncovering admissible evidence, aiding witness preparation, . . . or assisting impeachment or rebuttal." United States v. Graham, 83 F.3d 1466, 1474 (D.C. Cir. 1996)(internal quotation marks omitted)(quoting United States v. Lloyd, 992 F.2d 348, 351 (D.C. Cir. 1993))(internal quotation marks omitted). "Although the materiality standard is not a heavy burden, the Government need disclose rule 16 material only if it enables the defendant significantly to alter the quantum of proof in his favor." United States v. Graham, 83 F.3d at 1474 (alterations omitted)(citations omitted)(internal quotation marks omitted).

Rule 16(d)(2) "gives the district court broad discretion in imposing sanctions on a party who fails to comply with" Rule 16. United States v. Wicker, 848 F.2d 1059, 1060 (10th Cir. 1988).

> **(2)** **Failure to Comply.** If a party fails to comply with this rule, the court may:
>
> **(A)** order that party to permit the discovery or inspection; specify its time, place, and manner; and prescribe other just terms and conditions;
>
> **(B)** grant a continuance;
>
> **(C)** prohibit that party from introducing the undisclosed evidence; or
>
> **(D)** enter any other order that is just under the circumstances.

Fed. R. Crim. P. 16(d)(2). In selecting a proper sanction, "a court should typically consider (1) the reasons the government delayed producing requested materials, including whether the government acted in bad faith; (2) the extent of prejudice to defendant as a result of the delay;

and (3) the feasibility of curing the prejudice with a continuance." United States v. Charley, 189 F.3d 1251, 1262 (10th Cir. 1999)(internal quotation marks omitted)(quoting United States v. Gonzales, 164 F.3d 1285, 1292 (10th Cir. 1999)).

## LAW REGARDING THE UNITED STATES' DUTY TO DISCLOSE UNDER THE DUE PROCESS CLAUSE OF THE CONSTITUTION OF THE UNITED STATES

The Due Process Clause of the Constitution requires that the United States disclose to the defendant any evidence that "is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." Brady, 373 U.S. at 87. The Supreme Court of the United States has extended the prosecution's disclosure obligation to include evidence that is useful to the defense in impeaching government witnesses, even if the evidence is not inherently exculpatory. See Giglio, 405 U.S. 153; Douglas v. Workman, 560 F.3d 1156, 1172-73 (10th Cir. 2009)("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [United States'] witnesses by showing bias and interest.'" (quoting United States v. Bagley, 473 U.S. 667, 676 (1985)); United States v. Abello-Silva, 948 F.2d 1168, 1179 (10th Cir. 1991)("Impeachment evidence merits the same constitutional treatment as exculpatory evidence."). Finally, the Supreme Court has refined Brady and clarified that it is not necessary that a defendant request exculpatory evidence: "Regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government." Kyles v. Whitley, 514 U.S. 419, 433 (1995)(quoting United States v. Bagley, 473 U.S. at 682). See Douglas v. Workman, 560 F.3d at 1172 ("The government's obligation to disclose exculpatory evidence does not turn on an accused's request."); United States v. Summers, 414 F.3d 1287, 1304 (10th Cir. 2005)("[T]he prosecution has an affirmative duty to disclose exculpatory evidence clearly supporting a claim of innocence even without request.").

1.      **Material Exculpatory Evidence Under** Brady.

"The Constitution, as interpreted in Brady, does not require the prosecution to divulge every possible shred of evidence that could conceivably benefit the defendant." Smith v. Sec'y of N.M. Dep't of Corr., 50 F.3d 801, 823 (10th Cir. 1995). Brady requires disclosure only of evidence that is both favorable to the accused, and "material either to guilt or to punishment." Brady, 373 U.S. at 87. "Evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. at 682. See United States v. Allen, 603 F.3d 1202, 1215 (10th Cir. 2010). A "reasonable probability," in turn, is a "probability sufficient to undermine confidence in the outcome." United States v. Bagley, 473 U.S. at 682 (internal quotation marks omitted). The Tenth Circuit has noted that "[t]he mere possibility that evidence is exculpatory does not satisfy the constitutional materiality standard." United States v. Fleming, 19 F.3d 1325, 1331 (10th Cir. 1994). The Tenth Circuit has also stated that evidence is material if it "might meaningfully alter a defendant's choices before and during trial . . . including whether the defendant should testify." Case v. Hatch, 731 F.3d 1015 (10th Cir. 2013)(quoting United States v. Burke, 571 F.3d 1048, 1054 (10th Cir. 2009))(internal quotation marks omitted).

"To be material under Brady, undisclosed information or evidence acquired through that information must be admissible." Banks v. Reynolds, 54 F.3d 1508, 1521 n.34 (10th Cir. 1995)(quoting United States v. Kennedy, 890 F.2d at 1059). The Supreme Court in Cone v. Bell, 556 U.S. 449 (2009), noted:

> Although the Due Process Clause of the Fourteenth Amendment, as interpreted by Brady, only mandates the disclosure of material evidence, the obligation to disclose evidence favorable to the defense may arise more broadly under a prosecutor's ethical or statutory obligations. See Kyles, 514 U.S. at 437 ("[T]he rule in Bagley (and, hence, in Brady) requires less of the prosecution than the ABA Standards for Criminal Justice Prosecution Function and Defense

Function 3-3.11(a) (3d ed. 1993)").  See also ABA Model Rules of Professional
Conduct 3.8(d) (2008)("The prosecutor in a criminal case shall" "make timely
disclosure to the defense of all evidence or information known to the prosecutor
that tends to negate the guilt of the accused or mitigates the offense, and, in
connection with sentencing, disclose to the defense and to the tribunal all
unprivileged mitigating information known to the prosecutor, except when the
prosecutor is relieved of this responsibility by a protective order of the tribunal").

556 U.S. at 470 n.15.

The government bears the burden of producing exculpatory materials; defendants have no
obligation to first point out that such materials exist.  See Kyles v. Whitley, 514 U.S. at 437
(stating that the prosecution has an affirmative duty to disclose evidence, because "the
prosecution, which alone can know what is undisclosed, must be assigned the consequent
responsibility to gauge the likely net effect of all such evidence and make disclosure when the
point of 'reasonable probability' is reached"); United States v. Deutsch, 475 F.2d 55, 57 (5th Cir.
1973)(granting a mistrial for failure to produce personnel files of government witnesses),
overruled on other grounds by United States v. Henry, 749 F.2d 203 (5th Cir. 1984); United
States v. Padilla, No. CR 09-3598 JB, 2011 WL 1103876, at *6 (D.N.M. Mar. 14,
2011)(Browning, J.).  This obligation means that the United States must "volunteer exculpatory
evidence never requested, or requested only in a general way."  Kyles v. Whitley, 514 U.S. at
433 (internal quotation marks omitted).  Additionally, "[u]nder Brady, the good or bad faith of
government agents is irrelevant."  United States v. Quintana, 673 F.2d 296, 299 (10th Cir. 1982).
"This means, naturally, that a prosecutor anxious about tacking too close to the wind will
disclose a favorable piece of evidence."  Kyles v. Whitley, 514 U.S. at 439.

2.     **Timing of the Disclosure Under Brady.**

"The obligation of the prosecution to disclose evidence under Brady can vary depending
on the phase of the criminal proceedings and the evidence at issue."  United States v. Harmon,

871 F. Supp. 2d 1125, 1149 (D.N.M. 2012)(Browning, J.).   As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in <u>Brady v. Maryland</u>."   <u>United States v. Burke</u>, 571 F.3d at 1054.   The Tenth Circuit has recognized, however, that "[i]t would eviscerate the purpose of the <u>Brady</u> rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial."   <u>United States v. Burke</u>, 571 F.3d at 1054.   "[T]he belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an 'earlier disclosure would have created a reasonable doubt of guilt.'"   <u>United States v. Burke</u>, 571 F.3d at 1054.   The Tenth Circuit has stated:

> Where the district court concludes that the government was dilatory in its compliance with <u>Brady</u>, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

<u>United States v. Burke</u>, 571 F.3d at 1054.   Notably, "not every delay in disclosure of <u>Brady</u> material is necessarily prejudicial to the defense."   <u>United States v. Burke</u>, 571 F.3d at 1056.   "To justify imposition of a remedy, the defense must articulate to the district court the reasons why the delay should be regarded as materially prejudicial."   <u>United States v. Burke</u>, 571 F.3d at 1056.

Once a prosecutor's obligations under <u>Brady</u> have been triggered, however, they "continue[] throughout the judicial process."   <u>Douglas v. Workman</u>, 560 F.3d at 1173.   For instance, the prosecutor's obligation to disclose <u>Brady</u> material can arise during trial.   See <u>United States v. Headman</u>, 594 F.3d at 1183 (10th Cir. 2010)("Although <u>Brady</u> claims typically arise from nondisclosure of facts that occurred before trial, they can be based on nondisclosure of favorable evidence (such as impeachment evidence) that is unavailable to the government until

trial is underway.").  The disclosure obligation continues even while a case is on direct appeal.

See United States v. Headman, 594 F.3d at 1183; Smith v. Roberts, 115 F.3d 818, 819, 820 (10th

Cir. 1997)(applying Brady to a claim that the prosecutor failed to disclose evidence received

after trial but while the case was on direct appeal).

The Supreme Court has held that Brady does not require "preguilty plea disclosure of

impeachment information."  United States v. Ruiz, 536 U.S. 622, 629 (2002)("We must decide

whether the Constitution requires that preguilty plea disclosure of impeachment information.

We conclude that it does not.").  The Supreme Court recognized that "impeachment information

is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary."

United States v. Ruiz, 536 U.S. at 632 (emphasis in original).  The Supreme Court acknowledged

that, "[o]f course, the more information the defendant has, the more aware he is of the likely

consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but

concluded that "the Constitution does not require the prosecutor to share all useful information

with the defendant."  United States v. Ruiz, 536 U.S. at 632.  The Supreme Court added:

> [T]his Court has found that the Constitution, in respect to a defendant's awareness
> of relevant circumstances, does not require complete knowledge of the relevant
> circumstances, but permits a court to accept a guilty plea, with its accompanying
> waiver of various constitutional rights, despite various forms of misapprehension
> under which a defendant might labor.

United States v. Ruiz, 536 U.S. at 630.  The Supreme Court explained that "a constitutional

obligation to provide impeachment information during plea bargaining, prior to entry of a guilty

plea, could seriously interfere with the Government's interest in securing those guilty pleas that

are factually justified, desired by defendants, and help to secure the efficient administration of

justice."  United States v. Ruiz, 536 U.S. at 630.  The Tenth Circuit has reiterated these

principles from United States v. Ruiz:

Johnson asserts that his plea was not knowing and voluntary because he did not know that he was giving up a claim that the government failed to disclose impeachment evidence. The Supreme Court, however, foreclosed this exact argument in United States v. Ruiz, by holding that the government has no constitutional obligation to disclose impeachment information before a defendant enters into a plea agreement. Ruiz emphasized that "impeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary." Rather, "a waiver [is] knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances -- even though the defendant may not know the specific detailed consequences of invoking it."

United States v. Johnson, 369 F. App'x 905, 906 (10th Cir. 2010)(unpublished)(quoting United

States v. Ruiz, 546 U.S. at 630).[5]

The Tenth Circuit has held, however, that United States v. Ruiz does not apply to

exculpatory evidence but rather applies only to impeachment evidence:

Ruiz is distinguishable in at least two significant respects. First, the evidence withheld by the prosecution in this case is alleged to be exculpatory, and not just impeachment, evidence. Second, Ohiri's plea agreement was executed the day jury selection was to begin, and not before indictment in conjunction with a "fast-track" plea. Thus, the government should have disclosed all known exculpatory information at least by that point in the proceedings. By holding in Ruiz that the government committed no due process violation by requiring a defendant to waive her right to impeachment evidence before indictment in order to accept a fast-track plea, the Supreme Court did not imply that the government may avoid

---

[5]United States v. Johnson is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it. See 10th Cir. R. 32.1(A)("Unpublished opinions are not precedential, but may be cited for their persuasive value."). The Tenth Circuit has stated:

In this circuit, unpublished orders are not binding precedent, . . . and we have generally determined that citation to unpublished opinions is not favored. However, if an unpublished opinion or order has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005)(citations omitted). The Court finds that United States v. Johnson and United States v. Ohiri, 133 F. App'x 555 (10th Cir. 2005)(unpublished), have persuasive value with respect to a material issue, and will assist the court in its disposition of this Memorandum Opinion and Order.

the consequence of a <u>Brady</u> violation if the defendant accepts an eleventh-hour
plea agreement while ignorant of withheld exculpatory evidence in the
government's possession.

<u>United States v. Ohiri</u>, 133 F. App'x 555, 562 (10th Cir. 2005)(unpublished).  The Tenth Circuit qualified its holding in <u>United States v. Ohiri</u>, however, stating that the case presented "unusual circumstances."  133 F. App'x at 562.

The United States Courts of Appeals "have split on the issue whether <u>Brady v. Maryland</u>'s restrictions apply to suppression hearings."  <u>United States v. Harmon</u>, 871 F. Supp. 2d at 1151.  In an unpublished opinion, the Tenth Circuit, without discussing whether <u>Brady</u> applies to a suppression hearing, rejected a defendant's argument that the prosecution violated <u>Brady</u> by failing to disclose impeachment evidence before a suppression hearing on the basis that the evidence was not impeachment evidence and not material.  <u>See</u> <u>United States v. Johnson</u>, 117 F.3d 1429, 1997 WL 381926, at *3 (10th Cir. 1997)(unpublished table decision).  Specifically, the Tenth Circuit found:

> [D]isclosure of the evidence existing at the time of the hearing, even if
> impeaching, would not establish a reasonable probability that the outcome of the
> suppression hearing would have been different.  First, we question whether the
> evidence in question would have been admitted at the suppression hearing.  Even
> if it had been admitted, however, in light of [the defendant's] lack of truthfulness,
> our confidence in the result of the hearing has not been undermined.  Therefore,
> we hold that the evidence was not material, and that its nondisclosure by the
> prosecution does not constitute a <u>Brady</u> violation.

<u>United States v. Johnson</u>, 1997 WL 381926, at *3 (citation omitted).

The United States Court of Appeals for the District of Columbia Circuit has recognized that "it is hardly clear that the <u>Brady</u> line of Supreme Court cases applies to suppression hearings," because "[s]uppression hearings do not determine a defendant's guilt or punishment, yet <u>Brady</u> rests on the idea that due process is violated when the withheld evidence is 'material either to guilt or to punishment.'"  <u>United States v. Bowie</u>, 198 F.3d 905, 912 (D.C. Cir.

- 18 -

1999)(citation omitted).  Without deciding the issue and in an unpublished opinion, the United States Court of Appeals for the Sixth Circuit quoted with approval this language from United States v. Bowie.   See  United States v. Bullock, 130 F. App'x 706, 723 (6th Cir. 2005)(unpublished)("Whether the suppression hearing might have come out the other way, however, is of questionable relevance to the Brady issues at stake here.").  The United States Court of Appeals for the Seventh Circuit held that, under its precedent and the law from other circuits, it was not "obvious" for clear-error purposes that "Brady disclosures are required prior to suppression hearings."  United States v. Stott, 245 F.3d 890, 902 (7th Cir. 2001).  The Second Circuit also noted that Brady's applicability to suppression hearings was not "obvious" for plain error purposes.  See United States v. Nelson, 193 F. App'x 47, 50 (2006).

Before the Supreme Court issued its United States v. Ruiz decision, the Fifth Circuit and the United States Court of Appeals for the Ninth Circuit held that Brady applies to suppression hearings.  See United States v. Barton, 995 F.2d 931, 935 (9th Cir. 1993)("[W]e hold that the due process principles announced in Brady and its progeny must be applied to a suppression hearing involving a challenge to the truthfulness of allegations in an affidavit for a search warrant."); Smith v. Black, 904 F.2d 950, 965-66 (5th Cir. 1990)("Timing is critical to proper Brady disclosure, and objections may be made under Brady to the state's failure to disclose material evidence prior to a suppression hearing."), vacated on other grounds, 503 U.S. 930 (1992).

Most recently, the Tenth Circuit has suggested that Brady does not apply to suppression hearings, because "Brady rests on the idea that due process is violated when the withheld evidence is material to either guilt or punishment," but "[s]uppression hearings do not determine a defendant's guilt or punishment."  United States v. Dahl, 597 F. App'x 489, 491 n.2 (10th Cir. 2015)(quoting United States v. Lee Vang Lor, 706 F.3d 1252, 1256 n.2 (10th Cir. 2013

(acknowledging that "[w]hether *Brady's* disclosure requirements even apply at the motion to suppress stage is an open question")).  Although the United States Courts of Appeals have split on whether Brady applies to suppression hearings, "it is not likely that a prosecutor must disclose impeachment evidence before a suppression hearing in light of the Supreme Court's conclusion in United States v. Ruiz that a prosecutor does not have to disclose impeachment evidence before the entry of a guilty plea."  United States v. Harmon, 871 F. Supp. 2d at 1151.  The Tenth Circuit affirmed United States v. Harmon, in which the Court concluded that the United States need not disclose impeachment information before a suppression hearing.

> Given that the Court has located no Tenth Circuit case deciding this issue, the Court believes that the Tenth Circuit would extend the holding of United States v. Ruiz to suppression hearings.  The Supreme Court's rationale distinguishing the guilty-plea process from a trial applies equally to a comparison of the suppression-hearing process and a trial.  The Court believes that both the Tenth Circuit and the Supreme Court would recognize that impeachment evidence need not be disclosed before a suppression hearing.  In United States v. Ruiz, the Supreme Court recognized that "impeachment information is special in relation to the *fairness of a trial*, not in respect to whether a plea is voluntary."  United States v. Ruiz, 536 U.S. at 632, 122 S. Ct. 2450 (emphasis in original).  It acknowledged that, "[o]f course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be," but concluded that "the Constitution does not require the prosecutor to share all useful information with the defendant."  United States v. Ruiz, 536 U.S. at 632, 122 S. Ct. 2450.  Likewise, "the more information the defendant has, the more" likely he will be able to successfully suppress a particular piece of evidence, but "the Constitution does not require the prosecutor to share all useful information with the defendant."  United States v. Ruiz, 536 U.S. at 632, 122 S. Ct. 2450.

United States v. Harmon, 871 F. Supp. 2d at 1169, aff'd, 742 F.3d 451 (10th Cir. 2014).

Accordingly, Brady does not require the United States to disclose impeachment evidence before suppression hearings.  See United States v. Harmon, 871 F. Supp. 2d at 1165-67.

## LAW REGARDING THE JENCKS ACT

In Jencks v. United States, 353 U.S. 657, 667 (1957), the Supreme Court held that a "criminal action must be dismissed when the Government, on the ground of privilege, elects not

to comply with an order to produce, for the accused's inspection and for admission in evidence, relevant statements or reports in its possession of government witnesses touching the subject matter of their testimony at trial."  353 U.S. at 672.  In so holding, the Supreme Court recognized that the

> rationale of the criminal cases is that, since the Government which prosecutes an accused also has the duty to see that justice is done, it is unconscionable to allow it to undertake prosecution and then invoke its governmental privileges to deprive the accused of anything which might be material to his defense.

353 U.S. at 671.  Congress later codifies the Jencks v. United States into 18 U.S.C. § 3500.  See United States v. Kimoto, 588 F.3d 464, 475 (7th Cir. 2009)(explaining that "the Jencks Act, 18 U.S.C. § 3500[,] . . . was enacted in response to the Supreme Court's holding in Jencks v. United States, 353 U.S. 657 . . . ").

Section 3500 of Title 18 of the United States Code provides:

> **(a)**   In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case.

> **(b)**   After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified.  If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

18 U.S.C. §§ 3500(a)-(b).  "The Jencks Act requires the government to disclose to criminal defendants any statement made by a government witness that is 'in the possession of the United States' once that witness has testified."  United States v. Lujan, 530 F. Supp. 2d at 1232 (quoting 18 U.S.C. §§ 3500(a) & (b)).  The Jencks Act "manifests the general statutory aim to restrict the

use of such statements to impeachment." Palermo v. United States, 360 U.S. 343, 349 (1959). The Jencks Act's purpose is "not only to protect Government files from unwarranted disclosure but also to allow defendants materials usable for the purposes of impeachment." United States v. Smaldone, 544 F.2d 456, 460 (10th Cir. 1976)(citing Palermo v. United States, 360 U.S. at 352).

> The Jencks Act defines statements as:
>
> **(1)**    a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> **(2)**    a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or
>
> **(3)**    a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

18 U.S.C. § 3500(e).

The Tenth Circuit has held: "Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim." United States v. Smith, 984 F.2d 1084, 1086 (10th Cir. 1993). At least one district court within the Tenth circuit has distinguished interview notes from reports that "embody only the agent's epitomization, interpretation, or impression of an interview," finding that the latter are not producible under the Jencks Act. United States v. Jackson, 850 F. Supp. 1481, 1508 (D. Kan. 1994)(Crow, J.). In United States v. Lujan, the Honorable Robert C. Brack, United States District Judge for the District of New Mexico, explained that rough interview notes may be discoverable under the Jencks Act, when a defendant makes "at least . . . a colorable claim that an investigator's discarded rough notes contained exculpatory evidence not included in any formal interview report provided to the defense." 530 F. Supp. 2d at 1266. Judge Brack went on to hold that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential

impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500.  530 F. Supp. 2d at 1267.  See United States v. Cooper, 283 F. Supp. 2d 1215, 1238 (D. Kan. 2003)(Crow, J.)(noting that rough interview notes may be discoverable under the Jencks Act); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act).

The defendant bears the initial burden of showing that particular materials qualify under the Jencks Act, but the defendant's burden is not heavy.  See United States v. Smaldone, 544 F.2d at 460 ("[T]he burden is on the defendant to show that particular materials qualify as 'Statements' and that they relate to the subject matter of the testimony of the witness."); United States v. Harry, 2013 684671, at *10 (D.N.M. Feb. 6, 2013)(Browning, J.).  To satisfy this burden, the defendant need not prove that particular materials are within the scope of the Jencks Act, as the documents are not in the defendant's possession, but rather, "must plainly tender to the Court the question of the producibility of the document at a time when it is possible for the Court to order it produced, or to make an appropriate inquiry."  United States v. Smith, 984 F.2d at 1086 (quoting Ogden v. United States, 303 F.2d 724, 733 (9th Cir. 1962)).  See United States v. Burton, 81 F. Supp. 3d 1229, 1250-51 (D.N.M. Jan. 26, 2015)(Browning, J.).  The defendant's demand for documents under the Jencks Act must be sufficiently precise for a court to identify the requested statements.  See United States v. Smith, 984 F.2d at 1086.  For example, in United States v. Smith, the Tenth Circuit found that a defendant had met his burden and made a prima facie showing that a statement of a witness existed which may be producible under the Jencks Act when a government witness testified during the United States' case-in-chief that she had been interviewed by a government agent before testifying, and the defense counsel moved for

production of the notes.  See 984 F.2d at 1085-86.  Once the defendant makes a prima facie showing that a witness statement exists that may be producible under the Jencks Act, the court should conduct a hearing or in camera review of the statement.  See 984 F.2d at 1086.

In United States v. Fred, No. CR 05-801 JB, the Court ordered the United States to produce "any personal notes or investigative materials that Federal Bureau of Investigation" agents "may have created regarding an interview" with the defendant.  No. CR 05-801 JB, Order at 1, filed November 8, 2006 (Doc. 86).  The Court required the United States to disclose the notes and investigative materials in a timely manner, so that the defendant could properly prepare for cross-examination at trial of the FBI agent who conducted the interview.  See No. CR 05-801 JB, Order at 1-2.  The Court has applied the Jencks Act to Drug Enforcement Agency agents' notes, generated from interviews with defendants, holding that the notes must be turned over to the defendants after the agents testify at trial.  See United States v. Goxcon-Chagal, No. CR 11-2002 JB, 2012 WL 3249473, at *2, *6 (D.N.M. Aug. 4, 2012)(Browning, J.).  In United States v. Tarango, 760 F. Supp. 2d 1163 (D.N.M. 2009)(Browning, J.), the Court, applying 18 U.S.C. § 3500, held that the United States must produce Federal Bureau of Investigation ("FBI") agents' 302s, after the United States' witnesses testified at trial, to the extent those reports contained statements from witnesses who testified at trial.  See 760 F. Supp. 2d at 1164, 1167.

## THE NEED FOR PRACTICAL AND EFFECTIVE CRIMINAL DISCOVERY

In 1990, a jury convicted Debra Milke of murdering her four-year-old son, Christopher. See Milke v. Ryan, 711 F.3d 998, 1000 (9th Cir. 2013).  The judge sentenced her to death.  The Honorable Alex Kozinski, Chief Justice for the Ninth Circuit, described the trial as "a swearing contest between Milke and Phoenix Police Detective Armando Saldate, Jr."  711 F.3d at 1000. At the trial, Saldate testified that Milke confessed to the murder; Milke vehemently protested her

innocence and denied confessing.  See 711 F.3d at 1000.  With no other witnesses, the judge and

jury believed Saldate.  They were unaware, however, of one fact that might have changed their

minds: Saldate had a "long history of lying under oath and other misconduct."  711 F.3d at 1000-

01.  Specifically, Saldate had lied to a grand jury or a judge in four cases, requiring state judges

to throw out indictments or confessions.  See 711 F.3d at 1004.  In another four cases, "judges

threw out confessions or vacated convictions because Saldate had violated suspects' Miranda and

other constitutional rights during interrogations, often egregiously."  711 F.3d at 1004.  Finally,

Saldate's personnel file documented a five-day suspension "for taking sexual liberties with a

motorist he stopped and then lying to his supervisors about it."  711 F.3d at 1011.  The file

revealed that his "supervisors had caught him in a lie and concluded that his credibility was

compromised."  711 F.3d at 1006, 1012 (describing the report as showing that "Saldate has no

compunction about lying during the course of his official duties" and that he has "a willingness

to abuse his authority to get what he wants").  The information about Saldate's misconduct was

in the hands of the party responsible for ensuring that justice is carried out -- the state.

Unfortunately, however, the state did not disclose this information, despite its requirements

under Brady and Giglio.  See Milke v. Ryan, 711 F.3d at 1005 (describing how the state did not

mention the evidence, even though a critical question in Milke's case was whether Saldate

ignored Milke's request for an attorney).  "This error resulted in a 'one-sided presentation of

evidence' and 'impeded [the jury's] ability to fully and fairly assess the credibility of both

[Milke] and Saldate."  Milke v. Ryan, 711 F.3d at 1005 (alterations in the original).  More than

that, however, the error resulted in Milke's death sentence and imprisonment on death row for

twenty-two years.  See Milke v. Ryan, 711 F.3d at 1001.[6]

---

[6]After the Ninth Circuit vacated Milke's conviction and gave Arizona the chance to re-try

The disclosure problem is not confined to the context of overzealous police officers closing murder cases.  It reaches to all corners of the criminal justice system.  Judges and scholars are increasingly recognizing the problem with blatant <u>Brady</u> violations.  <u>See</u> Daniel S. Medwed, Brady<u>'s Bunch of Flaws</u>, 67 Wash. & Lee L. Rev. 1533 (2010); David Keenan et al., <u>The Myth of Prosecutorial Accountability After </u>Connick v. Thompson<u>: Why Existing Professional Responsibility Measures Cannot Protect Against Prosecutorial Misconduct</u>, 121 Yale L.J. Online 203 (2011).  For example, in 2012, an investigation revealed that two Department of Justice prosecutors intentionally hid evidence in the 2008 political corruption case against Senator Ted Stevens, the longest serving Republican Senator in history.  <u>See</u> <u>United States v. Stevens</u>, No. 08-cr-231 (EGS), 2009 WL 6525926 (D.D.C. April 7, 2009)(Sullivan, J.). <u>See</u> Henry F. Schuelke III, Special Counsel, Report to Hon. Emmet G. Sullivan of Investigation Conducted Pursuant to the Court's Order (dated April 7, 2009), filed March 15, 2012 in <u>In re Special Proceedings</u>, No. 1:09-mc-00198-EGS (D.D.C. March 15, 2012)("Stevens Report"). Special prosecutor Henry F. Schuelke III's blistering report found that the United States team concealed documents that would have damaged the credibility of key United States witnesses and helped the late Stevens to defend himself against false-statements charges.  <u>See</u> Stevens Report at 12.  Stevens lost his Senate seat as the scandal unfolded, dying at age eighty-six in a plane crash two years later.  <u>See</u> Carrie Johnson, <u>Report: Prosecutors Hid Evidence in Ted Stevens Case</u>, NPR News (May 15, 2012), http://www.npr.org/2012/03/15/148687717/report-prosecutors-hid-evidence-in-ted-stevens-case.  Schuelke based his 500-page report on a review

---

Milke, the Arizona Court of Appeals barred any re-trial in a scathing opinion that garnered the New York Times' attention.  <u>See</u> <u>Arizona: No Retrial for Woman Freed from Death Row</u>, N.Y. Times (Dec. 11, 2014), http://www.nytimes.com/2014/12/12/us/arizona-no-retrial-for-woman-freed-from-death-row.html?_r_1.   The Court of Appeals described the "long course of <i>Brady/Giglio</i> violations" as a "flagrant denial of due process" and a "severe stain on the Arizona justice system."  <u>Milke v. Mroz</u>, 339 P.3d 659, 665-66, 668 (Ariz. App. Ct. 2014).

of 128,000 documents and interviews with prosecutors and FBI agents.  See Stevens Report at

12.  United States Attorney General Eric Holder moved to vacate Stevens' conviction.  See Jerry

Seper, Inquiry Slams Prosecution of Stevens Corruption Case By Justice Department, The

Washington Times (March 15, 2012).  The Department of Justice ("DOJ") subsequently

"instituted a sweeping training curriculum for all federal prosecutors, and made annual discovery

training mandatory."  Mark Memmott, Report Slams Sen. Stevens' Prosecutors, NPR News

(March 15, 2012), http://www.npr.org/sections/thetwo-way/2012/03/15/148668283/report-slams-

sen-stevens-prosecutors.

       As Milke v. Ryan and the Stevens Report reveal, prosecutors hold a tremendous amount

of power in criminal prosecutions, often more than the jury.  See Alex Kozinski, Criminal Law

2.0, 44 Geo. L.J. Ann. Rev. of Crim. Proc. iii, xxii (2015)(explaining that prosecutors often hold

more power "than jurors because most cases don't go to trial").  They are the ones with access to

the evidence, both inculpatory and exculpatory.  They can disclose it easier than anyone else can.

See Scott H. Greenfield, The Flood Gates Myth, Simple Justice (Feb. 16, 2015),

http://blog.simplejustice.us/2015/02/16/the-flood-gates-myth/.   As one illustration, in Milke v.

Ryan, Milke discovered the impeachment evidence detailing Saldate's misconduct "only after a

team of approximately ten researchers in post-convictions proceedings spent nearly 7000 hours

sifting through court records."  711 F.3d at 1018.  The team worked eight hours a day for three

and a half months searching through the clerk of court's officers for Saldate's name in every

criminal case file from 1982 to 1990.  See 711 F.3d at 1018.  It took another researcher another

month to review motions and transcripts from each of those cases to find examples of Saldate's

misconduct.  See 711 F.3d at 1018.  The Ninth Circuit concluded: "A reasonably diligent lawyer

couldn't possibly have found these records in time to use them at Milke's trial."  711 F.3d at

1018.  The prosecutor was in the best position to give Milke the opportunity to effectively cross-examine Saldate and ensure that she had a fair trial.  Although <u>Brady</u> and <u>Giglio</u> require prosecutors to disclose exculpatory evidence to the defense, it is often extremely difficult for criminal defendants to know whether the prosecution is complying with this obligation.  Furthermore, prosecutors exert tremendous control over witnesses.

> They can offer incentives -- often highly compelling incentives -- for suspects to testify.  This includes providing sweetheart plea deals to alleged co-conspirators and engineering jail-house encounters between the defendant and known informants.  Sometimes they feed snitches non-public information about the crime so that the statements they attribute to the defendant will sound authentic.  And, of course, prosecutors can pile on charges so as to make it exceedingly risky for a defendant to go to trial.  There are countless ways in which prosecutors can prejudice the fact-finding process and undermine a defendant's right to a fair trial.

Kozinski, <u>supra</u>, at xxii (internal footnotes omitted).

To address this problem, Holder put together a working group of senior prosecutors, law enforcement representatives, and information technology professionals to improve the DOJ's discovery practices.  <u>See</u> <u>Hearing on the Special Counsel's Report on the Prosecution of Senator Ted Stevens</u> at 3-4, Committee on the Judiciary United States Senate (March 28, 2012)("Hearing").  The DOJ then issued guidelines that federal prosecutors must follow in complying with their discovery obligations in criminal cases.  <u>See</u> Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Issuance of Guidance and Summary of Actions Taken in Response to the Report of the Department of Justice Criminal Discovery and Case Management Working Group (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Requirement for Office Discovery Policies in Criminal Matters (Jan. 4, 2010); Memorandum for Department Prosecutors from David W. Ogden, Deputy Attorney General, Regarding Guidance for Prosecutors Regarding Criminal Discovery (Jan. 4, 2010), https://www.justice.gov/dag/memorandum-

department-prosecutors.  These memoranda are intended to establish a methodical approach to discovery obligations and to address inconsistent discovery practices among prosecutors within the same office.  See Hearing at 4-5.  Although these memoranda are "not intended to have the force of law or to create or confer any rights, privileges or benefits," DOJ attorneys will likely have to follow the guidance in the memoranda to argue that they have complied with their discovery obligations.  Later in January 2010, Deputy Attorney General David W. Ogden appointed a long-serving career prosecutor as the DOJ's first full-time National Criminal Discovery Coordinator to lead and oversee all DOJ efforts to impose disclosure practices.  See Hearing at 4.

Many courts and scholars, however, have argued that training prosecutors is insufficient to fully combat discovery abuse.  Instead of relying on prosecutors alone to disclose all potentially exculpatory evidence, they have suggested that judges take a more active role in preventing Brady and Giglio violations.  See United States v. Jones, 686 F. Supp. 2d 147, 149 (D. Mass. 2010)(Wolf, J.)(expressing the district court's skepticism that prosecution-initiated training sessions, in the absence of strong judicial action, would effectively curb Brady violations).  Chief Judge Kozinski has asserted that "[t]here is an epidemic of *Brady* violations abroad in the land.  Only judges can put a stop to it."[7]  United States v. Olsen, 737 F.3d 625, 626 (9th Cir. 2013)(Kozinski, C.J., dissenting).  Two years after Chief Judge Kozinski described the "epidemic of *Brady* violations," he observed that his use of the phrase "caused much controversy but brought about little change in the way prosecutors operate."  Kozinski, supra, at viii (citing Center for Prosecutor Integrity, An Epidemic of Prosecutor Misconduct, White Paper (Dec.

_____

[7]Neither Chief Judge Kozinski nor anyone else has empirically shown that an epidemic of Brady violations is occurring.  The Court does not see it.  The Assistant United States Attorneys appear to take their duties very seriously.

2013), available at http://www.prosecutorintegrity.org/wp-content/uploads/EpidemicofProsecutor-Misconduct.pdf. Accordingly, he proposed some additional reforms, such as requiring open-file discovery. See Kozinski, supra, at xxvi-vii. North Carolina has adopted such a rule by statute that requires courts to order the "State to make available to the defendant the complete files of all law enforcement agencies, investigatory agencies, and prosecutors' offices involved in the investigation of the crimes committed or the prosecution of the defendant." N.C. Gen. Stat. § 15A-903(a)(1) (2011). The DOJ, however, has opposed such a law, instead advocating that prosecutors should remain in charge of deciding what evidence will be material to the defense. See Video Recording: Ensuring that Federal Prosecutors Meet Discovery Obligations: Hearing on S. 2197 Before the S. Judiciary Comm., 112th Cong. (2012)(on file with S. Judiciary Comm.)(statement of James M. Cole, Deputy Att'y Gen., U.S. Dep't of Justice opposing the bill: "[I]n reacting to the *Stevens* case, we must not let ourselves forget . . . true improvements to discovery practices will come from prosecutors and agents . . . . In other words, new rules are unnecessary."); Eric Holder Jr., Preface, In the Digital Age, Ensuring that the Department Does Justice iii, 41 Geo. L.J. Ann. Rev. Crim. Proc. (2012). Chief Judge Kozinski contends that effectively deterring Brady and Giglio violations means that prosecutorial offices across the country must establish firm open-file policies to ensure compliance.[8] See Kozinski, supra, at xxviii.

---

[8]In New Mexico, the New Mexico Legislature has not enacted an open-file policy for its state prosecutors, nor does the United States Attorney's Office -- according to the Assistant United States Attorney in this case -- operate under an open-file policy. See Tr. at 12:7-15 (Hurtado)("I want to affirm clearly in open Court and on the record that there is no open file policy that the U.S. Department of Justice or the United States Attorney's office follows either in this district or across the entire United States."). Despite the Assistant United States Attorney's contention in this case, however, the United States Attorney's Office has previously represented to the Court that the Albuquerque office operates under such a policy. See United States v. Rodella, 2015 WL 711931, at *39, n.12 (D.N.M. Feb. 2, 2015)(Browning, J.)(stating that the

_____

United States Attorney's Office for the District of New Mexico has "consistently represented that they maintain an 'open file policy'"). The Court recognized that, despite the United States' representations that it maintains an open-file policy, its "conduct before the Court suggests otherwise." United States v. Rodella, 2015 WL 711931, at *39 n.12.

These attorneys have at times shown that they are willing to disclose to criminal defendants only the bare minimum that the law requires and nothing more. In *United States v. Roybal*, No. CR 12-3182 JB, 2014 WL 4748136 (D.N.M. Sept. 4, 2014)(Browning, J.), the United States refused to produce certain raw wiretap data and progress reports they made concerning wiretaps. *See* 2014 WL 4748136, at *1. The United States did not give a reason for denying the defendants' request for the information, other than the law did not require it to produce the documents. *See* 2014 WL 4748136, at *4. Again in *United States v. Folse*, the United States refused to disclose reports related to a shooting between a co-defendant and a Federal Bureau of Investigation agent for a similar reason: the law did not require it to disclose the information. *See United States v. Folse*, No. CR 14–2354, Unsealed Memorandum Opinion and Order, filed January 26, 2015 (Doc. 75). . . By its very name -- the Department of Justice -- the United States is also interested in the pursuit of justice. In refusing to disclose evidence, documents, and materials unless the law requires it to produce the items, the United States may be undermining the appearance of justice. Defendants are often left in the dark, not knowing what information the United States has in its possession. While Courts and Congress have placed requirements on what information the United States must disclose, these requirements are a bare minimum and not a recommendation. Criminal defendants are already at a disadvantage, because of the United States' resources and because the United States gets a head start in every case by being able to investigate before bringing an indictment. The United States need not compound this disadvantage by refusing to give over any evidence unless it is absolutely required. After the United States secures a conviction, the criminal defendant, and the public at large, should feel that the conviction was based on a fair trial in which there was nothing else the defendant could have done to obtain a different result -- *i.e.* the appearance of justice. The nation may not be well served when a defendant is left wondering whether things would have been different if the United States had disclosed all of the information that it possessed. By refusing to disclose all available information, the United States may create the perception that it obtained a conviction through gamesmanship and concealment, *i.e.*, through sharp practices, and not through the pursuit of truth and justice. This perception undermines the pillars of our criminal justice system. The Court will continue to faithfully follow the law and will not require the United States to disclose any information which the law does not require it to disclose. The Court, however, cautions the United States that, if it continues its pattern of refusing to disclose available information to criminal defendants, it is undermining the representation that it routinely makes that it has an open file policy and that the Court will take that purported policy with a grain of salt. That representation, which is not

While these reforms may indeed decrease the number of <u>Brady</u> and <u>Giglio</u> violations that occur, the Court cannot unilaterally impose those requirements upon attorneys.  Judges have several other tools at their disposal, however, and the Court uses several of these tools to ensure compliance with <u>Brady</u> and <u>Giglio</u> in the District of New Mexico.  First, while the Court must rely heavily on the prosecutors to do their job under <u>Brady</u> and <u>Giglio</u>, the Court does more than rely solely on the prosecutors to comply with their obligations.  <u>See</u> Kozinski, <u>supra</u>, at xxxiii ("*Brady* is not self-enforcing; failure to comply with *Brady* does not expose the prosecutor to any personal risk."); <u>Imbler v. Pachtman</u>, 424 U.S. 409, 430, 431 n.34 (1976)(noting that prosecutors are absolutely immune for "activities [that are] intimately associated with the judicial phase of the criminal process," including the willful suppression of exculpatory evidence).   The Court enters orders at the beginning of the case directing prosecutors to comply with those obligations by disclosing documents and objects, reports and tests, expert witness opinions, and all relevant material that <u>Brady</u> and <u>Giglio</u> require.[9]  If courts do not enter an order requiring prosecutors to comply with <u>Brady</u> and <u>Giglio</u>, the court lacks the power to sanction attorneys, because those attorneys will not have violated any court-imposed obligations.  <u>See</u> Henry F. Schuelke III, <u>supra</u>, at 507-510.   By entering such orders, the Court can hold prosecutors personally responsible for failures to disclose information.

---

completely accurate, and the unclear practices of the Assistant United States Attorneys undermine the administration of justice and the public's perception of the justice system. It also puts its convictions unnecessarily at risk, if the Court is wrong that the United States did not have to produce the documents. The United States is a key player in the adversarial system; as the people's representative, it too plays a fundamental role in ensuring the appearance of justice.

<u>United States v. Rodella</u>, 2015 WL 711931, at *39.  It appears that the United States has finally abandoned its representations that it has an open-file policy.

[9]The District of New Mexico routinely enters such orders.  <u>See</u> Order, filed December 9, 2015 (Doc. 18).

Second, when prosecutors hide <u>Brady</u> and <u>Giglio</u> material, courts can name the offending prosecutors in their judicial opinions.  One author terms this technique "public shaming."  Adam M. Gershowitz, <u>Prosecutorial Shaming: Naming Attorneys to Reduce Prosecutorial Misconduct</u>, 42 U.C. Davis L. Rev. 1059 (2009).  Naming prosecutors' names can serve as a unique tool to encourage compliance with a prosecutor's disclosure obligations.  Prosecutors will know that non-compliance can expose them to embarrassment in front of their friends and colleagues.  <u>See</u> Jenia Iontcheva Turner, <u>Policing International Prosecutors</u>, 45 N.Y.U. J. Int'l L. & Pol. 175, 229 (2012)("The court's judgment condemning particular actions of prosecutors as unlawful can serve as a potent deterrent for most prosecutors, who would not like to be called out publicly by a court for failing in their obligation.").  While the Court is usually reluctant, in both civil and criminal cases, to name the attorneys it sanctions, prosecutors run the risk that the Court may, depending on the egregiousness of a violation, believe that more than a sanction is necessary.

Finally, several scholars have endorsed Professor Jason Kreag's proposal that judges engage in a formal colloquy with the prosecutor on the record during pretrial hearings.  <u>See</u> Jason Kreag, <u>The Brady Colloquy</u>, 67 Stan. L. Rev. Online 47 (2014); Kozinski, <u>supra</u>, at xxxiv (endorsing Kreag's colloquy); Adam M. Samaha & Lior Jacob Strahilevitz, <u>Don't Ask, Must Tell -- And Other Combinations</u>, 103 Cal. L. Rev. 919, 984 n.296 (2015).  Kreag suggests that trial judges routinely ask a series of questions such as:

1. Have you reviewed your file, and the notes and file of any prosecutors who handled this case before you, to determine if these materials include information that is favorable to the defense?

2. Have you requested and reviewed the information law enforcement possesses, including information that may not have been reduced to a formal written report, to determine if it contains information that is favorable to the defense?

3. Have you identified information that is favorable to the defense, but nonetheless elected not to disclose this information because you believe that

the defense is already aware of the information or the information is not material?

4. Are you aware that this state's rules of professional conduct require you to disclose all information known to the prosecutor that tends to be favorable to the defense regardless of whether the material meets the *Brady* materiality standard?

5. Now that you have heard the lines of cross-examination used by the defense and have a more complete understanding of the theory of defense, have you reviewed your file to determine if any additional information must be disclosed?

Kreag, supra, at 50-51 (internal footnotes omitted).  Kreag contends that the formality of facing a judge on the record impresses upon prosecutors the need to scrupulously comply with their disclosure obligations.  See Kreag, supra, at 49.  He further argues that the colloquy will require prosecutors to explain why they are not disclosing certain information at the time they decide not to disclose that information, instead of asking for an explanation years later when the non-disclosure comes to light.  See Kreag, supra, at 53-54.

The Court agrees that some form of pretrial questioning will increase compliance with Brady and Giglio.  Despite this agreement, the Court believes that the formal colloquy that Kreag proposes is not only unnecessary, but also somewhat impractical for district judges that see hundreds of criminal cases a year.  Because the District of New Mexico sees more felony cases than any other federal district in the country,[10] and more criminal cases than most courts in the

---

[10]In addition to seeing more felony cases than other courts, the District of New Mexico consistently sees more criminal cases than most other courts in the country.  See Criminal Cases Commenced, Terminated, and Pending (Including Transfers), During the 12-Month Periods Ending   March   31,   2014   and   2015,   JNET,   Criminal   Caseload   Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables   ("Criminal Filings").  In 2015 alone, 4,227 criminal cases were filed in the District of New Mexico.  See Criminal Filings at 1.  Only Arizona, with 5,059, and Texas' Southern and Western Districts, with 5,491 and 6,074, respectively, saw more criminal filings.  See Criminal Filings at 1.  In comparison, 98 criminal cases were filed in the District of Rhode Island, 128 were filed in Vermont, 116 were filed in the Northern District of Mississippi, 109 were filed in the Western

country, the Court has developed professional relationships with the United States Attorneys who appear before it on a regular basis.  See Criminal Cases Commenced, by Number of Felony Defendants, Excluding Reopens, During the 12-Month Period Ending March 31, 2015, JNET, Criminal Caseload Tables, http://jnet.ao.dcn/resources/statistics/caseload-tables/criminal-caseload-tables (listing New Mexico as having the highest number of criminal cases involving felony defendants in the nation).  Asking United States Attorneys whether they intentionally refused to disclose exculpatory information can appear derogatory and insulting to attorneys who frequently appear before the Court.  See Radley Balko, Judge Says Prosecutors Should Follow Law.  Prosecutors Revolt., The Wash. Post. (March 7, 2014), http://www.washingtonpost.com/news/the-watch/wp/2014/03/07/judge-says-prosecutors-should-follow-the-law-prosecutors-revolt (describing how a prosecutor opposed the Arizona Supreme Court's recommendation that Arizona adopt an ethical rule to ensure that prosecutors disclose new evidence of a potential wrongful conviction, in part because he was insulted by the suggestion that an ethical guideline was needed to encourage him to do what he claimed he would do as a matter of course).  Kreag concedes that "some prosecutors might be insulted by having to answer these or similar questions from the court, believing that the questions themselves amount to an accusation."  Kreag, supra, at 56.  The Court agrees with this assessment.  The Court has known many of these lawyers for years; there is no need to insult them with questions about whether they have complied with their ethical duties that it does not ask of defense lawyers or civil lawyers.

Moreover, the Court can accomplish the same goals that the colloquy seeks to accomplish by getting assurances at a pretrial hearing that the United States has complied with its duty.

---

District of Wisconsin, and 61 were filed in the Eastern District of Oklahoma.  See Criminal Filings at 1.

Merely holding a hearing or a pretrial conference where the United States Attorney knows that he or she must answer to the Court about discovery issues and what has been produced heightens the importance of disclosing Brady and Giglio material; the hearing impresses upon attorneys the seriousness of their representations to the Court.[11]   The Court can therefore "signal to young prosecutors [] the importance the judge places on enforcing a prosecutor's ethical and *Brady* obligations" by holding a hearing or pretrial conference and asking about discovery issues, without running through a standardized and potentially insulting checklist.  Kreag, supra, at 54. Second, a hearing or pretrial conference does more than demonstrate the seriousness of the situation.  Like the colloquy, it also personalizes the prosecutor's decision not to disclose.  A hearing or pretrial conference requires prosecutors to acknowledge that they made the non-disclosure decision and that they are responsible for providing an explanation for that non-disclosure.  Furthermore, the hearing emphasizes -- without having to say it -- that they may be sanctioned for any misrepresentations they make about Brady and Giglio material.  This accountability -- and threat of sanctions for making misrepresentations to the Court -- increases disclosure on the front-end without the need for "public shaming" on the back end if the Court later discovers a Brady or Giglio violation.  The Court agrees that some of Kreag's suggested questions may be useful in some hearings or pretrial conferences.  Other situations, however, call for more pointed and probing questions.  Moving away from a checklist of questions gives judges the flexibility to get to the point more quickly and easily, to ask specific questions rather than general ones, and to avoid impairing its working relationship with United States Attorneys

---

[11]Those professors and judges who have endorsed the formal colloquy do not hear criminal cases at the district court level, especially with the frequency that the Court does.  See Kozinski, supra; Kreag, supra.  The District of New Mexico sentences hundreds more criminal defendants than judges in most other districts.  A formal colloquy is not always practical in this context.

and the assistants in the meantime.  Finally, holding a hearing or pretrial conference encourages prosecutors to review their notes and to effectively prepare a reason for non-disclosure early in the proceedings.  Accordingly, while asking some of Kreag's questions may be helpful, the Court can more practically curb <u>Brady</u> and <u>Giglio</u> violations by asking questions tailored to the circumstance rather than going through a standardized formal checklist.

In sum, the Court is not comfortable with engaging in a colloquy with an Assistant United States Attorney like he or she is a defendant.  While no one wants to admit this fact, the truth is that, if the DOJ prosecutors do not do their duties under <u>Brady</u> and <u>Giglio</u> the system is in trouble.  The Court, the defense bar, and the nation, to a great extent, trust them.  They are, therefore, entitled to respect, not suspicion, mistrust, or hostility, until they conduct themselves in a manner that is unprofessional.  Sometimes more vigilance is achieved in a respectful environment than one where the Court asks the lawyer: "Have you been ethical today?"

One additional check that the Court requires of prosecutors is to disclose officers' and investigators' notes as "statement[s]" within the meaning of the Jencks Act.  <u>See</u> <u>United States v. Harry</u>, 2013 WL 684671, at *1 (D.N.M. Feb. 6, 2013)(Browning, J.).   As explained above, some courts -- including the Court -- have concluded that an officer's interview notes may be "statement[s]" that the Jencks Act requires the United States to disclose.  18 U.S.C. § 3500.  <u>See</u> <u>United States v. Harry</u>, 2013 WL 684671, at *11-12 ("The United States must turn over to Harry, after the witness testifies at trial, any investigative notes containing statement from those witnesses . . . ."); <u>United States v. Tarango</u>, 760 F. Supp. 2d at 1164, 1167 (requiring the United States to produce FBI reports, which contain statements from prosecution witnesses after those witnesses testify at trial); <u>United States v. Cooper</u>, 283 F. Supp. 2d at 1238 (noting that rough interview notes may be discoverable under the Jencks Act); <u>United States v. Smith</u>, 984 F.2d at

1086 ("Interview notes could be 'statements' under the [Jencks] Act if they are substantially verbatim."); United States v. Jackson, 850 F. Supp. at 1508-09 (finding that interview notes may be producible under the Jencks Act). Officers then maintain these notes pursuant to various standards and protocols. See United States v. Harrison, 524 F.2d 421, 424 n.2 (D.C. Cir. 1975); United States v. Lujan, 530 F. Supp. 2d at 1267 (stating that, "[b]ecause the contents of rough interview notes may in some cases be subject to disclosure and because the potential impeachment value of the notes may not become evident until trial," the United States must preserve its rough interview notes "made by law enforcement agents during interview of potential witnesses" under 18 U.S.C. § 3500). Officers then use their notes as the basis for their reports. When officers write their reports, however, they may exclude certain information that does not help the prosecution. These reports are then placed in a prosecutor's file, but the notes are not. To ensure that any impeachment information is disclosed, the Court requires prosecutors to disclose the investigating officer's notes as Jencks material after the government witness testifies at trial. This disclosure could reveal information that conflicts with the officer's report, serving as valuable impeachment evidence. The more often that district judges require prosecutors to disclose a testifying officer's notes, the more care officers will take to ensure that their reports reflect their notes and accurately summarize the events leading to an arrest. Even if some courts resist requiring such disclosure, see United States v. Lujan, 530 F. Supp. 2d 1224, 1266 (D.N.M. 2008)(Brack, J.), cases are randomly assigned to different judges. The threat of being assigned to a judge who requires disclosure may incentivize officers to include all exculpatory and impeachment evidence in their formal report. Additionally, even if a prosecutor's file omits the officer's notes, courts must require prosecutors to disclose exculpatory information in officers' notes under Brady. See Kyles v. Whitley, 514 U.S. 419, 437

(1995)(placing an affirmative obligation on prosecutors to learn of exculpatory evidence in others' possession); United States v. Padilla, 2011 WL 1103876, at *5 (D.N.M. Mar. 14, 2011)(Browning, J.)("The Due Process Clause of the Constitution requires the United States to disclose information favorable to the accused that is material to either guilt or to punishment."); United States v. Burke, 571 F.3d at 1054 (holding that the "belated disclosure of impeachment or exculpatory information favorable to the accused violates due process when an earlier disclosure would have created a reasonable doubt of guilt").

## ANALYSIS

Pursuant to the Court's order at the hearing, the United States must review each testifying officer's personnel file to determine whether any Brady or Giglio material exists. If the United States uncovers any such exculpatory material, it must produce any material evidence in time for its effective use at trial. See United States v. Coppa, 267 F.3d 132, 144 (2d Cir. 2001)("[W]e reiterate the longstanding constitutional principle that as long as a defendant possesses *Brady* evidence in time for its effective use, the government has not deprived the defendant of due process of law."). The Court addressed all three of the United States' disclosure objections at the hearing. First, although the United States initially argued that it lacked access to the requested information, see Response at 6-7, it acknowledged at the hearing that the BCSO participated in the joint investigation with the federal government and that the United States had access to information within the officers' personnel files. See Tr. at 6:1-3 (Hurtado)(stating that the BCSO was participating in the joint investigation with the United States); Tr. at 6:13-24 (Court,

Hurtado)(stating that the United States had already interviewed each of the officers); Tr. at 6:25-7:1 (Hurtado)(stating that the United States could likely access the officers' personnel files).[12]

Second, the United States originally argued that it need not produce information regarding officers who would not testify at the suppression hearing. See Response at 4-5. The Court does not require the United States to produce impeachment information on all officers, nor does it require the United States to produce this information before the suppression hearing, because Brady and Giglio do not require the United States to produce impeachment evidence before suppression hearings. See United States v. Harmon, 871 F. Supp. at 1165 ("Even if the evidence is impeachment evidence, Brady v. Maryland did not require the United States to disclose this evidence to Harmon before his suppression hearing."). Instead, the Court requires the United States to review the personnel files of the officers who will testify at trial, and to disclose any Brady or Giglio material in time for its effective use at trial. See Tr. at 13:14-23 (Court); United States v. Burke, 571 F.3d at 1054 (recognizing that "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to

---

[12]The Court has consistently stated that it cannot require the United States to go get documents from third parties or to seek documents that refuse access to the United States. See Tr. at 13:24-14:2 ("And like I said and I've said this in the past, I don't want to require the Government to do any more than the law requires. So I'm trying to toe that line."); United States v. Rivas, 26 F. Supp. 3d 1082, 1105 (D.N.M. 2014)(Browning, J.)("A prosecutor does not have a duty . . . to obtain evidence from third parties."); United States v. Badonie, 2005 WL 2312480, at *2 (D.N.M. Aug. 29, 2005)(Browning, J.)("It is well settled that there is no affirmative duty upon the government to take action to discover information which it does not possess."). Here, however, the United States has such access to BCSO's personnel files, even if the BCSO still has custody or possession of them. See United States v. Padilla, 2011 WL 1103876, at *7 (D.N.M. March 14, 2011)(Browning, J.)("[A] prosecutor's office cannot get around Brady by keeping itself in ignorance, or by compartmentalizing information about different aspects of a case."); id. ("A prosecutor must disclose information of which it has knowledge and access."); United States v. Brooks, 966 F.2d 1500, 1503 (D.C. Cir. 1992)(stating that a prosecutor may have a duty to search files maintained by other "governmental agencies closely aligned with the prosecution" when there is "some reasonable prospect or notice of finding exculpatory evidence"). The Court wants to ensure that the United States is the one determining that no Brady or Giglio material exists rather than the BCSO. See Tr. at 14:1-7 (Court).

postpone disclosures to the last minute, during trial").  The Court notes, however, that the United States asserted that it would disclose any impeachment information relating to those officers who will testify at the suppression hearing before the suppression hearing.  See Response at 5.

Finally, the United States argues that it need not produce the requested information because Hykes has not yet shown that the information is material.  See Response at 11.  As the Court expressed at the hearing, however, the Court is not requiring the United States to produce information that is not material.  See Tr. at 13:14-19 (Court)("Make that review, I'm not ordering any sort of production of the personnel files [or] really it's not ordering any production.  It's just simply, let's have you take a look and you make an attorney's evaluation of what's there."); Tr. at 8:17-9:2 (Court).  It requires only that the United States review its files for possible Brady or Giglio material, and produce any such material evidence if it exists.  See United States v. Burton, 81 F. Supp. 3d at 1254 (directing the United States to "take a second look" at certain reports "to determine whether they contain any material that must be disclosed").  Courts "are almost unanimous in holding that in response to a specific motion . . . the prosecution is required to review the identified personnel file for Brady material."  Snowden v. State, 672 A.2d 1017, 1023 (Del. 1996)(Holland, J.).  See Milke v. Ryan, 711 F.3d at 1006; United States v. Quinn, 123 F.3d 1415, 1421 (11th Cir. 1997)(requiring the government to search personnel records for Brady or Giglio material).  Similarly, the current United States Attorneys' Manual also requires prosecutors "to seek all exculpatory and impeachment information from . . . federal, state, and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant."  United States Attorneys' Manual §9-5-001(B)(2)(2014).  It is well-established that law enforcement officers' personnel files can

often include <u>Brady</u> or <u>Giglio</u> material.[13]   <u>See</u> Jonathan Abel, Brady<u>'s Blind Spot: Impeachment</u>

<u>Evidence in Police Personnel Files and the Battle Splitting the Prosecution Team</u>, 67 Stan. L.

---

[13]Personnel files can contain a wealth of exculpatory and impeachment information:

A report in one case found that a detective's "image of honesty, competency, and overall reliability must be questioned."  Records in another revealed a detective's repeated lies to internal affairs investigators, a psychological assessment that the detective "should not be entrusted with a gun and badge," and a warning to the police department from the office of the state attorney general: "If you had a homicide tonight . . ., I would instruct you that [the detective] not be involved in the case in any capacity."  Findings from other cases excoriated officers for making false overtime claims, filing false police reports, and stealing from the police department.  When this misconduct has come out, sometimes decades after trial, murder convictions have been overturned and people have been released from death row.

Jonathan Abel, <u>Brady's Blind Spot: Impeachment Evidence in Police Personnel Files and the Battle Splitting the Prosecution Team</u>, 67 Stan. L. Rev. 743, 746 (2015)(internal footnotes omitted).

The United States Attorneys' Manual also recognizes that personnel files often can contain impeachment information.

[P]otential impeachment information relating to agency employees may include, but is not limited to . . .

i) any finding of misconduct that reflects upon the truthfulness or possible bias of the employee, including a finding of lack of candor during a criminal, civil, or administrative inquiry or proceedings;

ii) any past or pending criminal charge brought against the employee;

iii) any allegation of misconduct bearing upon truthfulness, bias, or integrity that is the subject of a pending investigation;

iv) prior findings by a judge that an agency employee has testified untruthfully, made a knowing false statement in writing, engaged in an unlawful search or seizure, illegally obtained a confession, or engaged in other misconduct;

v) any misconduct finding or pending misconduct allegation that either casts a substantial doubt upon the accuracy of any evidence -- including witness testimony -- that the prosecutor intends to rely on to prove an element of any crime charged, or that might have a significant bearing on the admissibility of prosecution evidence.

Rev. 743, 746 (2015)(compiling cases in which police officers' personnel files contained <u>Brady</u> and <u>Giglio</u> material); United States Attorneys' Manual § 9-5.100(5)(c)(recognizing that personnel files may contain <u>Brady</u> and <u>Giglio</u> material).

Furthermore, Hykes is not sending the United States on a fishing expedition. Hykes demonstrates that the officers' personnel files may contain impeachment evidence. As support, Hykes points to the officers' involvement in several excessive-force lawsuits, discrepancies between the officers' story and eyewitnesses' stories, and evidence that the officers had a personal feud with Hykes. <u>See</u> Tr. at 5:11-20 (Baiz); <u>Giglio</u> Motion at 4 (noting that witnesses have revealed that the information upon which the officers relied to arrest Hykes was false and that he was arrested on site, beaten and searched without warrants); Motion to Suppress at 4 (explaining that detectives yelled "this is personal" when apprehending and allegedly beating Hykes). <u>Cf.</u> <u>United States v. Lafayette</u>, 983 F.2d 1102 (D.C. Cir. 1993)(affirming the denial of the appellants' request for an officer's personnel file, because "nothing in appellants' brief informs us why they have any reason to believe that the personnel files would provide any useful evidence whatsoever"); <u>United States v. Andrus</u>, 775 F.2d 825, 843 (7th Cir. 1985)(noting that the defendant was "not entitled to the personnel files of the law enforcement witnesses without even a hint that impeaching material was contained therein"). Hykes also requested specific information within the personnel files. <u>See</u> <u>Giglio</u> Motion at 2. Accordingly, the United States must search the personnel files of the testifying officers pursuant to the Court's order at the hearing, examining the list of documents that Hykes specifically requests in his <u>Giglio</u> Motion. <u>See</u> <u>United States v. Deutsch</u>, 475 F.2d 55, 57 (5th Cir.1973)(granting a mistrial for failure to

---

United States Attorneys' Manual § 9-5.100(5)(c).

produce personnel files of government witnesses), <u>overruled on other grounds by United States v. Henry</u>, 749 F.2d 203 (5th Cir.1984); <u>United States v. Padilla</u>, 2011 WL 1103876, at *6.

**IT IS ORDERED** that: (i) the Defendant's Motion for Information Pursuant to *Giglio v. United States* Regarding All Arresting Officers and Those Involved in the Search, filed February 29, 2016 (Doc. 25), is granted in part and denied in part; and (ii) the United States must review the personnel files of those officers who will testify at trial for exculpatory or impeachment evidence, and ask the BCSO for the specific list of items that Hykes listed in his <u>Giglio</u> Motion.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Damon P. Martinez
  United States Attorney
Samuel A. Hurtado
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

*Attorneys for the Plaintiff*

Sylvia A. Baiz
  Federal Public Defender
Federal Public Defender's Office
Albuquerque, New Mexico

*Attorney for the Defendant*