# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                    No. CR 15-4299 JB

GRANT HYKES,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on the Petition for Revocation of Supervised Release, filed January 14, 2011 (Doc. 87)("Petition"). The Court held evidentiary revocation hearings on: (i) March 28, 2022, <u>see</u> Clerk's Minutes at 1, filed March 28, 2022 (Doc. 120)("March 28 Clerk's Minutes"); (ii) April 19, 2022, <u>see</u> Clerk's Minutes at, filed April 19, 2022 (Doc. 121)("April 19 Clerk's Minutes"); and (iii) November 14, 2022, <u>see</u> Clerk's Minutes at 1, filed November 14, 2022 (Doc. 128)("November 14 Clerk's Minutes"). The primary issues are whether Hykes: (i) sexually penetrated a minor, in violation of N.M.S.A. § 30-9-11(D)(1); (ii) made sexual contact with a minor, in violation of N.M.S.A. § 30-9-13(B)(2)(a); (iii) intimidated a witness, in violation of N.M.S.A. § 30-24-3(A)(3); (iv) abused a child, in violation of N.M.S.A. § 30-6-1(D)(1); and (v) used or possessed alcohol, in violation of his supervised release special condition. The Court concludes, by a preponderance of the evidence, that Hykes: (i) did not sexually penetrate a minor; (ii) did not have sexual contact with a minor; (iii) did not intimidate a witness; (iv) did not abuse a child; but (v) used or possessed alcohol. Accordingly, because Hykes committed a Grade C violation and has a criminal history category of II, the United States Sentencing Guidelines ("U.S.S.G." or "the Guidelines") establish a revocation imprisonment range of 4 to 10 months.

## PROCEDURAL BACKGROUND

On March 21, 2017, the Court sentenced Hykes to 48 months imprisonment for one count of violating 18 U.S.C. § 922(g)(1) for being a felon in possession of a firearm and ammunition. See Judgment in a Criminal Case at 1, filed January 14, 2018 (Doc. 82)("Judgment"). The Court also imposed three years of supervised release following Hykes' release from prison. See Judgment at 1. For Hykes' supervised release, the Court imposed four mandatory conditions, thirteen standard conditions, and seven special conditions. See Judgment at 3-5. Hykes' first mandatory condition is: "You must not commit another federal, state, or local crime." Judgment at 3. Hykes' first special condition is: "You must not use or possess alcohol." Judgment at 5.

Hykes began his supervision on May 7, 2019. See Petition at 1. On May 13, 2020, the United States Probation Office ("USPO") notified the Court that Hykes had provided a positive breath alcohol sample. See Report on Offender Under Supervision No Court Action Recommended, filed May 13, 2020 (Doc. 83). The Court ordered that no action was necessary at that time. See Order, filed May 18, 2020 (Doc. 84)(text-only entry). On January 12, 2021, the USPO again notified the Court that Hykes had provided a positive breath alcohol sample. See Report on Offender Under Supervision No Court Action Recommended, filed January 12, 2021 (Doc. 85). The Court again ordered that no action was necessary at that time. See Order, filed January 20, 2021 (Doc. 86)(text-only entry). Hykes' term of supervised release was set to expire on May 7, 2022. See Petition at 1.

## FINDINGS OF FACT

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must

state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d)'s purposes. The Court makes these findings by a preponderance of the evidence. See 18 U.S.C. § 3583(e)(3). The Federal Rules of Evidence do not apply to revocation proceedings. See United States v. Henry, 852 F.3d 1204, 1206 (10th Cir. 2017). Instead, in making these findings, the Court does not consider any evidence or testimony from the hearing that violates the balancing test that the United States Court of Appeals for the Tenth Circuit adopted in United States v. Jones, 818 F.3d 1091, 1098 (10th Cir. 2016)("Jones"). "When applying the balancing test, the Court must weigh the defendant's interest in cross-examining and confronting [a] witness with the government's good cause for not presenting the witness." United States v. Hernandez, 428 F. Supp. 3d 775, 788 (D.N.M. 2019)(Browning, J.)(citing Jones, 818 F.3d at 1098).

1.      **The Weekend of November 27, 2021.**

1.      On November 27, 2021, the Saturday following Thanksgiving, Hykes and his girlfriend, Bethany Coburn, went to Hykes' ranch in Tijeras, New Mexico. See Transcript of Hearing at 25:2-4 (taken April 19, 2022)("April 19 Tr.")(Coburn), filed May 25, 2022 (Doc. 123).

2.      Hykes' ranch occupies five acres of land, see April 19 Tr. at 36:11 (Coburn), and has "a little house," a camper-style RV trailer, and "a bunch of animals[:] goats, chickens, ducks, dogs and a horse," see Transcript of Hearing at 61:17-25 (taken March 28, 2022)("March. 28 Tr.")(Moss, Zinck), filed May 25, 2022 (Doc. 122).

3.      At the time, Hykes and Coburn had been dating for roughly a year-and-a-half. See April 19 Tr. at 20:2-3 (Coburn)(testifying that, as of April 2022, the two had been dating for "almost two years").

4.      Their relationship was "serious," but "not sexual," April 19 Tr. at 20:5 (Coburn),

but "not sexual," April 19 Tr. at 20:24 (Coburn) because whenever Coburn attempted sexual activities with Hykes, "[t]here was no physical response on his part.  He was unable to obtain an erection," April 19 Tr. at 20:22-21:8 (Moss, Coburn).

5.      Coburn's mother and grandmother, as well as Coburn's colleague and friend, Marina Zinck, joined Hykes and Coburn at the ranch.  See March 28 Tr. at 25:14-16 (Coburn).

6.      At some point that day, Zinck and Coburn left the ranch to go to a convenience store.  See March 28 Tr. at 62:20-24 (Zinck).

7.      When they returned, they saw that fifteen-year-old Jane Doe had arrived with her mother, Aubrey[1] Howard, and her mother's partner,[2] Mikai Cropsey.  See March 28 Tr. at 62:25-63:18 (Moss, Zinck); April 19. Tr. at 26:10 (Coburn).

8.      Howard is Hykes' "ex-girlfriend."  See April 19 Tr. at 26:10-11 (Coburn).

9.      Cropsey is Hykes' friend, who Hykes often hires to help him "fix stuff around the ranch."  April 19 Tr. at 26:10-22 (Coburn, Moss).

10.     Doe had visited Hykes' property on prior occasions, "to do chores and hang out with the animals."  March 28. Tr. at 39:24-25 (Daugherty).

11.     On November 27, Howard appeared "very tired" and seemed "detached."  March 28 Tr. at 64:10-14 (Zinck).

12.     Doe also appeared "very tired" and "frustrated with her mom."  March 28 Tr. at

---

[1]Different witnesses referred to Howard by different first names.  See March 28 Tr. at 62:14-15 (Zinck)(referring to Howard as "Abby"); April 19 Tr. at 6:17-21 (Daugherty)(explaining that Howard "goes by a couple of different names," including "Audrey" and "Aubrey").

[2]The nature of Howard and Cropsey's relationship is unclear.  Some witnesses referred to Cropsey as Howard's "boyfriend," see April 19 Tr. at 6:4 (Daugherty), but Coburn clarified that they had gotten married shortly before the evidentiary hearings, see April 19 Tr. at 26:14-16 (Moss, Coburn)(explaining that Howard had "recently married" Cropsey).

64:23-25 (Zinck).

13.    At one point that afternoon, while Howard was talking with Zinck, "[Doe] got up, and as she was walking away [Howard] started cussing, cussing about [Doe]."  March 28 Tr. at 65:3-9 (Zinck).

14.    Doe looked "very upset and distressed . . . like [she was] choking back tears." March 28 Tr. at 64:25-65:14 (Zinck).

15.    Howard, Cropsey, and Doe had been at the ranch for a "couple of hours," when Cropsey and Hykes had an "intense" and "physical" conversation.  April 19 Tr. at 28:9-23 (Coburn).

16.    Shortly after that conversation ended, Doe, Howard, and Cropsey left the ranch. See April 19 Tr. at 29:3-4 (Coburn).

17.    Hykes reported to the remaining guests that his intense conversation with Cropsey was related to Hykes' concerns about Doe's welfare and home environment.  See April 19 Tr. at 28:15-25 (Coburn, Moss).

18.    After the conversation, Doe, Cropsey, and Howard left the ranch.  See April 19 Tr. at 28:9-10 (Coburn).

19.    Coburn's mother and grandmother also left the ranch.  See April 19 Tr. at 29:17-18 (Coburn).

20.    Hykes, Coburn, and Zinck had a conversation because the three were "concerned," April 19 Tr. at 30:14 (Coburn), that "something very upsetting [was] going on with [Doe,]" March 28 Tr. at 68:1-2 (Zinck).

21.    Hykes, Coburn, and Zinck wanted to make "a plan to see what [they] could do to ensure the safety of Ms. Jane Doe."  April 19 Tr. at 29:20-21 (Coburn).

22.     They discussed the possibility of Doe staying with Zinck or with a number of other friends.  See April 19 Tr. at 30:5-13 (Coburn).

23.     Hykes also called Howard "to see if we could either go pick up Ms. Jane Doe or have [Howard and Cropsey] drop her back off" at Hykes' ranch.  April 19 Tr. at 30:14-17 (Coburn).

24.     Later that day, Howard and Cropsey "brought Ms. Jane Doe back up to the ranch." April 19 Tr. at 30:20-21 (Coburn).

25.     Hykes, Coburn, and Doe spent the night of November 27 at Hykes' ranch.  See April 19 Tr. at 31:6-8 (Coburn).

26.     Hykes and Coburn slept in the only bed and Doe slept on the couch.  See April 19 Tr. at 31:6-8 (Coburn).

27.     Coburn left the ranch the following morning, Sunday, November 28, 2021, around 9:30 a.m.  See April 19 Tr. at 31:9-10 (Moss, Coburn).

28.     Before leaving, Coburn called Zinck, informing her that Doe had arrived at the ranch and relaying Hykes' request that Zinck come back to the ranch with a lighter she'd taken and help exchange a toy she had purchased with Coburn at the convenience store.  See March 28 Tr. at 70:4-10 (Zinck).

29.     Zinck stayed at the ranch for roughly five hours, arriving around 10:00 a.m. and leaving around 3:00 p.m.  See March 28 Tr. at 70:21-25 (Moss, Zinck).

30.     On Sunday, Doe's demeanor was "completely different" than the day before; she was "very relaxed and she was smiling."  March 28 Tr. at 71:10-13 (Zinck).

31.     Doe spent Sunday night, November 28, 2021, with Hykes at his ranch.  See April 19 Tr. at 30:24-22 (Coburn).

32.     Zinck and Coburn did not spend that evening at the ranch.  See March 28 Tr. at

70:25 (Zinck); April 19 Tr. at 30:24-25 (Coburn).

33.     The next day, Monday, November 29, 2021, Hykes dropped Doe off at home before seeing Coburn that evening.  See April 19 Tr. at 31:12-18 (Moss, Coburn).

**2.     Doe Reports Sexual Assault.**

34.     On Thursday, December 2, 2021, Doe, accompanied by Howard and Cropsey, went to the James McGrane Command Center ("McGrane Center"), a Bernalillo County, New Mexico Sheriff's Office ("BCSO") facility in Tijeras, New Mexico.  See March 28 Tr. at 20:10-18 (Daugherty).

35.     When Doe first arrived at the McGrane Center, she spoke with deputies and reported that Hykes had sexually assaulted her the evening of Sunday, November 28.  See March 28 Tr. at 34:13-24 (Daugherty).

36.     Doe had a preliminary medical evaluation and then was referred to see the Sexual Assault Nurse Examiner ("SANE") for an evaluation.  See March 28 Tr. at 34:16-24 (Daugherty).

37.     The deputies to whom Doe initially spoke also contacted Ross Daugherty, a detective in the BCSO's Special Victims Unit.  See March 28 Tr. at 22:12-23 (Daugherty).

38.     When Daugherty arrived at the McGrane Center, he and Deputy Sabo met with Doe, Howard, and Cropsey.[3]  See March 28 Tr. at 29:24-30:2 (Daugherty).

39.     During that conversation, Doe was "distraught" and emotionally upset."  March 28 Tr. at 30:18 (Daugherty).

_____

[3]For the reasons discussed in greater detail below, the Court declines to rely upon any of Doe's out-of-court statements.  Accordingly, the Court does not use the contents of any of Doe's interviews with Daugherty or with any other law enforcement official in making its findings of fact.

40.     Nonetheless, Doe was "polite" and "respectful," spoke "clearly," and "made eye contact." See March 28 Tr. at 31:18-19 (Daugherty).

41.     Doe had bruising on the front and side of her neck.  See March 28 Tr. at 30:20-21 (Daugherty).

42.     Daugherty then separated Doe from Howard and Cropsey so he could speak with her privately.  See March 28 Tr. at 31:21-25 (Daugherty).

43.     Sabo spoke to Howard and Cropsey while Daugherty spoke to Doe.  See March 28 Tr. at 32:8-9 (Daugherty).

44.     During Daugherty and Doe's conversation, Howard and Cropsey were on the other side of a large glass wall, out of their earshot but in their "direct line of sight."  March 28 Tr. at 31:20-32:5 (Daugherty).

45.     After speaking with Daugherty, Doe met with the SANE, who examined her, took photographs, and took notes.  See March 28 Tr. at 35:13-15 (Daugherty).

46.     The SANE also swabbed several areas of Doe's body, preserving the samples in a sexual assault evidence kit.  See Draft Transcript of Hearing at 4:6-7 (taken November 14, 2022) ("November 14 Tr.")(Moss, Byrdsong); id. at 9:3-9 (Byrdsong).[4]

47.      Daugherty later reviewed the notes and some of the photographs from Doe's SANE evaluation.  See March 28 Tr. at 35:13-15 (Daugherty).

48.      These notes reported examination noted that "Doe had abrasions in her vaginal area and tearing to her anus."  March 28 Tr. at 35:16-17 (Daugherty).

_____

[4]The Court's citations to the transcript of the November 14 hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

49.     She had "bruising in the area of her neck, close to the areas of her breasts, and around the buttocks and thigh."  March 28 Tr. at 35:20-24 (Daugherty).

**3.      Continued Investigation of Doe's Alleged Sexual Assault.**

50.     After his initial interview with Doe, Daugherty scheduled a forensic interview at the All Faiths Child Advocacy Center for Doe.  See March 28 Tr. at 37:5-8 (Daugherty).

51.     Doe attended the forensic interview on December 13.  See March 28 Tr. at 37:16 (Daugherty).

52.     Daugherty watched the interview remotely but in real time.  See March 28 Tr. at 30:4-11 (Daugherty, Hurtado).

53.     Sometime after the forensic interview, Doe attended a medical examination at Para Los Ninos at the University of New Mexico Hospital in Albuquerque, New Mexico.  See March 28 Tr. at 46:4-6 (Daugherty).

54.     On December 20, 2021, Hykes was served with a restraining order.  See April 19 Tr. at 32:22-24 (Coburn).

55.     The restraining order reflected Doe's allegations against Hykes.  See April 19 Tr. at 32:22-24 (Coburn).

56.     The day he received the restraining order, Hykes contacted his probation officer and on a subsequent day contacted an attorney.  See April 19 Tr. at 33:2-6 (Coburn).

57.     Daugherty interviewed Doe again on January 13, 2022.  See March 28 Tr. at 46:6-7 (Daugherty).

58.     Later that same day, Daugherty and other BCSO officers executed a search warrant for Hykes' ranch.  See March 28 Tr. at 47:25-48:2 (Daugherty).

59.     While executing the warrant, deputies "recover[ed] blue bedding, [a] red bath

towel, [and] an empty vodka bottle . . . ."  March 28 Tr. at 48:2-3 (Daugherty).

60.  A detective found the empty vodka bottle in a trash can near Hykes' trailer.  <u>See</u> April 19 Tr. at 16:6-8 (Daugherty)(testifying that the detective found the vodka bottle "in a trash can next to the RV"); <u>id</u>. at 37:14 (Coburn)(testifying that the trash can is 15 or 20 feet from the RV).

61.  The deputies then asked a State judge to issue an arrest warrant.  <u>See</u> March 28 Tr. at 48:5 (Daugherty).

**4.  <u>Hykes' Arrest</u>.**

62.  On January 13, 2022, Hykes was with Coburn at her home in Albuquerque.  <u>See</u> April 19 Tr. at 10-16 (Coburn).

63.  One of Hykes' neighbors called Hykes and told Hykes that there were "a bunch of police" on their street.  April 19 Tr. at 33:19 (Coburn).

64.  Hykes and Coburn got dressed, and left to go to Hykes' ranch.  <u>See</u> April 19 Tr. at 3-4 (Coburn).

65.  On the drive to the ranch, Hykes called his probation officer, who did not pick up, his lawyer, and a neighbor, whom he asked to let the police know that they were on their way.  <u>See</u> April 19 Tr. at 34:24-35:7 (Coburn).

66.  When they arrived, Hykes and Coburn spoke with various law enforcement officials, primarily Daugherty.  <u>See</u> April 19 Tr. at 35:18-22 (Coburn).

67.  Daugherty arrested Hykes and took him into custody.  <u>See</u> March 28 Tr. at 48:4-10 (Daugherty, Hurtado).

68.  At BSCO's main station, Daugherty interviewed Coburn.  <u>See</u> March 28 Tr. at 48:19-20 (Daugherty).

69.     During the interview, Coburn said that she thought that Doe was "truthful and honest."  March 28 Tr. at 49:10-11 (Daugherty).

70.     Coburn also informed Daugherty that Hykes was "impotent."  March 28 Tr. at 50:2 (Daugherty).

71.     Daugherty then interviewed Hykes.  <u>See</u> March 28 Tr. at 50:6-9 (Hurtado, Daugherty).

72.     Hykes confirmed that Doe had visited him and spent the night on November 28th, but denied assaulting Doe.  <u>See</u> March 28 Tr. at 52:17, 53:9-13 (Daugherty).

73.     Hykes also told Daugherty that he had erectile dysfunction disorder and could not maintain an erection.  <u>See</u> April 19 Tr. at 17:23-18:5 (Moss, Daugherty).

74.     Sitting about six feet away from Hykes, Daugherty "could smell an odor on his breath . . . consistent with alcohol."  March 28 Tr.at 51:25-52:2 (Daugherty).

75.     Daugherty asked Hykes about the smell, and Hykes admitted that "he had been drinking in the very early morning hours of that day."  March 28 Tr.at 52:2-4 (Daugherty).

**5.     <u>DNA Testing on Doe's SANE Evaluation Body Swabs and Items Recovered from Hykes' Home</u>.**

76.     Corinne Byrdsong, a DNA analyst at the Department of Public Safety's Forensic Laboratory in Santa Fe, New Mexico, conducted DNA testing on Doe's SANE evaluation body swabs and the items recovered from Hykes' home.  <u>See</u> November 14 Tr. at 4:5-14 (Moss, Byrdsong); <u>id</u>. at 9:3-9 (Byrdsong).

77.     Byrdsong conducted two rounds of DNA tests and recorded her results in two reports, dated March 21, 2022, and October 5, 2022, respectively.  <u>See</u> November 14 Tr. at 7:14-23 (Moss, Byrdsong); Laboratory Report at 1 (dated March 21, 2022), filed November 14, 2022

(Doc. 129)("First Report"); Laboratory Report at 2 (dated October 5, 2022), filed November 14, 2022 (Doc. 129-1)("Second Report").[5]

78.     During her first round of tests, Byrdsong tested five of Doe's body swabs, including the: (i) vaginal swab; (ii) anal swab; (iii) mons pubis/outer labia majora swab; (iv) neck swab; and (v) thigh swab.  See First Report at 1.

79.     No male DNA was detected on the vaginal swab or anal swab.  See First Report at 1.

80.     Male DNA was detected on the thigh swab, but "not in sufficient quantity for further DNA testing."  First Report at 1.

81.     Male DNA was detected on the mons pubis/outer labia majora swab and neck swab, but "not in sufficient quantity for conventional STR DNA testing."[6]   First Report at 1.

82.     During her second round of tests, Byrdsong conducted Y-STR testing[7] on the mons

---

[5]The Court filed the First Report and the Second Report under seal because they contain Doe's real name, and the Court would like to respect Doe's privacy.

[6]"STR" is shorthand for "short tandem repeat."  See Terry Taylor, *Sidebar: What Is STR Analysis?*, Nat'l Inst. of Just. J. (2011), available at https://nij.ojp.gov/topics/articles/what-str-analysis#:~:text=March%202%2C%202011%20Sidebar%20to%20the%20article%20Extending, uses%20is%20called%20%22STR%22%20%28short%20tandem%20repeat%29%20analysis ("STR Analysis")(no page numbers given).  Nearly 99.9% of a person's DNA is identical to every other human being's DNA.  STR Analysis.  Accordingly, using DNA to distinguish between individuals requires looking at the remaining 0.01% that varies from person to person. Within that 0.01%, certain regions of DNA that are particularly susceptible to (harmless) random mutations.  STR Analysis.  STR analysis looks at several of these locations, which are essentially meaningless by themselves but viewed together "can give nearly irrefutable evidence statistically of a person's identity."  STR Analysis.  STR Analysis is "most common type of DNA profiling today for criminal cases," and the chance that two people have identical STR results is without being identical twins is, at minimum, one in a billion.  STR Analysis.

[7]"Y-STR" is shorthand for "Y-chromosomal short tandem repeat."   Amy Jeanguenat, Y-STR Testing: Enhancing Sexual Assault and Cold Case Workflows (2018) at 1 ("Y-STR Testing").  Y-STR testing is a specialized form of DNA testing that "explicitly target STR regions

pubis/outer labia majora swab and the neck swab.  See November 14 Tr. at 9:17-21 (Moss, Byrdsong).

83.     Byrdsong's Y-STR testing revealed determined that Hykes "is eliminated as a source" of the male DNA found in the mons pubis/outer labia majora swab.  Second Report at 2.

84.     Byrdsong determined that "no interpretation or comparisons can be made" from the neck swab "due to an insufficient quantity of DNA in the sample."  Second Report at 2.

85.     During this second round of tests, Byrdsong also ran DNA tests on the blue bedding and red towel that law enforcement recovered from Hykes' home.  See Second Report at 2.

86.     More specifically, Byrdsong tested: (i) a general blanket swab; (ii) a swab of a stain on the blanket; (iii) a general towel swab; and (iv) a swab of a stain on the towel.  See November 14 Tr. at 12:6-10 (Byrdsong); id. at 14:7-10 (Byrdsong).

87.     The DNA in the general blanket swab came from one individual.  See Second Report at 2.

88.     The DNA found in the general blanket swab matched Hykes.  See Second Report at 2.

89.     Doe is eliminated as a potential source of the DNA in the general blanket swab. See Second Report at 2.

90.     The blanket stain swab contains a mixture of two individuals' DNA.  See Second Report at 1.

---

on the male Y chromosome that is passed down through the paternal lineage (i.e., father to son). By specifically targeting the Y-chromosome, a Y-STR profile can be unmasked in the presence of female DNA."  Y-STR Testing at 1.

91.     The major DNA profile[8] in the blanket stain swab matches Hykes.  See Second Report at 1.

92.     The test could not determine whether Doe was the mixture's "minor component." Second Report at 2.

93.     The general towel swab contains a mixture of two individuals' DNA.  See Second Report at 2.

94.     The major component of the DNA collected in the towel swab matches Hykes.  See Second Report at 1.

95.     Doe cannot be eliminated as the "minor component" of the DNA collected in the general towel swab.  See Second Report at 2.

96.     The towel stain swab reveals a mixture of DNA from three individuals.  See Second Report at 2.

97.     Hykes and Doe cannot be eliminated as sources of the DNA collected in the towel stain swab.  See Second Report at 2.

98.      No semen was detected in the towel stain swab.  See Second Report at 1.

**ADDITIONAL PROCEDURAL BACKGROUND**

On January 14, 2022, the USPO alleged that Hykes violated two supervised release conditions.  See Petition at 1.  First, the USPO asserts that Hykes violated his mandatory condition that he must not commit another federal, state, or local crime.  See Petition at 1-2.  It further alleges that he violated his special condition that he not possess or consume alcohol.  See Petition at 1-2.

---

[8]A "major component" refers to the individual who "contributed more DNA" to a DNA mixture than any other individuals who contributed DNA to the mixture.  November 14 Tr. at 12:18-22 (Byrdsong).

- 14 -

More specifically, the USPO alleges that Hykes "sexually penetrated a 15-year-old female vaginally, anally, and orally at his residence. He then told her not to tell anyone or he would be killed." Petition at 1. It further alleges that he "was drinking vodka during the time of the offense." Petition at 2. The USPO states that the maximum statutory penalty for these violations is two years imprisonment followed by up to three years of supervised release, and notes that the U.S.S.G. revocation imprisonment range is 15-21 months. See Petition at 2. On January 18, 2022, the Court issued an order for Hykes' arrest. See Order for Issuance of Arrest Warrant, filed January 18, 2022 (Doc. 89)(text-only entry).

The Court held an evidentiary hearing on the Petition on March 28, 2022. See March 28 Clerk's Minutes at 1. Hykes denied violating either supervised release condition. See March 28 Tr. at 7:23-8:3 (Court, Moss). Plaintiff United States of America indicated that it intended to present evidence. See March 28 Tr. 28 at 8:6-8 (Hurtado). The United States first called Hykes' probation officer, USPO Kelly Coppin. See March 28 Clerk's Minutes at 2; March 28 Tr. at 9:1 (Hurtado). Next, the United States called Daugherty. See March 28 Clerk's Minutes at 2; March 28 Tr. at 22:1-15 (Daugherty). Throughout his direct examination, Daugherty relied on Doe's out-of-court statements. See, e.g., March 28 Tr. at 29:3-4 (Daugherty); id. at 34:13-14 (Daugherty); id. at 40:11-25 (Daugherty). Hykes made a continuing objection to the United States' use of Doe's out-of-court statements, see March 28 Tr. at 34:1-2 (Moss), but the Court overruled that objection for the purposes of gathering evidence that day, asserting that it would admit them for the hearing and sort out the admissibility and weight of those statements later when it wrote the memorandum opinion and order. See March 28 Tr. 28 Tr. at 34:3-7 (Court).

Before proceeding to Daugherty's cross examination, Hykes moved to obtain a transcript of Daugherty's State grand jury testimony under rule 26.2 of the Federal Rules of Criminal

Procedure and the Jencks Act.  See March 28 Tr. at 53:20-24 (Moss).  The Court held a brief recess, see March 28 Tr. at 58:10 (Court), but the United States indicated it would take several days to get an audio recording to Hykes, see March 18 Tr. at 58:18-21 (Hurtado).  The Court determined it would have Daugherty step down so Hykes could cross examine him at a later date after reviewing the audio recording, and that it would have Hykes call one of his witnesses out of order.  See March 28 Tr. at 59:10-14 (Court).  Accordingly, Hykes called Zinck.  See March 28 Clerk's Minutes at 2; March 28 Tr. at 60:1 (Court).

The Court held a second evidentiary hearing on the Petition on April 19, 2022.  See April 19 Clerk's Minutes.  At that hearing, Daugherty re-took the stand for cross examination.  See April 19 Clerk's Minutes at 2; April 19 Tr. at 3:22 (Court).  The United States then rested.  See April 19 Tr. at 18:25-19:1 (Hurtado).  Hykes called Coburn as his second witness.  See April 19 Clerk's Minutes at 2; April 19 Tr. at 19:12 (Court).  The Defense rested.  See April 19 Tr. at 40:20 (Moss).  Finally, the Court heard closing arguments from the parties.  See April 19 Tr. at 41:7-9 (Court).  The Court also inquired why the United States had not called Doe as a witness.  See April 19 Tr. at 48:20-23 (Court).  The United States explained that it had not called Doe for two reasons: (i) it did not want to retraumatize Doe by having her testify; and (ii) it did not want to "jeopardize" the State prosecution of Hykes and, therefore, "made the strategic decision not to have Ms. Jane Doe testify."  April 19 Tr. at 49:11-24 (Hurtado).

Several months later, after the Court had begun working on this Memorandum Opinion and Order, Hykes filed his Unopposed Motion to Present Additional Evidence and Testimony Due to the Production of Exculpatory Evidence, filed October 18, 2022 (Doc. 124)("Additional Evidence Motion").  In the Additional Evidence Motion, Hykes moves the Court to "grant leave of defense counsel to present additional evidence and testimony concerning the alleged violation

of supervised release."  Additional Evidence Motion at 1.  Hykes further explains that "counsel received two DNA reports from the prosecutor in the state case . . . [that] are highly exculpatory." Additional Evidence Motion at 2.  The Court granted the Additional Evidence Motion, see Order Granting Defendant's Unopposed Motion to Present Additional Evidence and Testimony Due to the Production of Exculpatory Evidence, filed October 28, 2022 (Doc. 126), and set an evidentiary hearing for November 14, 2022, see Notice, filed October 16, 2022 (Doc. 125)(text-only entry).

The Court held a third evidentiary hearing on November 14, 2022.  See November 14 Clerk's Minutes.  At the hearing, Hykes called Byrdsong.  See November 14 Tr. at 3:11-15 (Court). Byrdsong testified about the DNA testing that she conducted in this case and the two reports that she produced that reflect her findings.  See November 14 Tr. at 6:17-18 (Moss, Byrdsong); First Report; Second Report.  Byrdsong began by describing her findings contained in the First Report. See November 14 Tr. at 7:23-8:9 (Moss, Byrdsong).  Byrdsong then moved to her Second Report. See November 14 Tr. at 9:7-9 (Byrdsong).  The United States did not cross-examine Byrdsong. See November 14 Tr. at 16:4-5 (Hurtado).  The Court asked Byrdsong some questions of its own. See November 14 Tr. at 16:7-18:7 (Court, Byrdsong).  The Court then excused Byrdsong after both parties declined the opportunity to ask follow-up questions.  See November 14 Tr. at 18:14-15 (Court).

The United States declined to make any concluding argument.  See November 14 Tr. at 18:25 (Hurtado).  The Court asked the United States to explain again why it chose not to call Doe at any of the revocation hearings.  See November 14 Tr. at 19:14-20:2 (Court).  The United States reiterated that it does not want to retraumatize Doe or "compromise" the parallel State criminal proceeding.  November 14 Tr. at 20:3-15 (Hurtado).  The United States also added that it was "fearful of having Ms. Jane Doe have to confront Mr. Hykes here in the courtroom," because Doe

is "afraid" of Hykes.  November 14 Tr. at 21:22-22:4 (Court, Hurtado).  Hykes' counsel, who is also Hykes' counsel in the State proceeding, stated that she has already interviewed Doe as part of the parallel State proceeding.  See November 14 Tr. at 25:20-26:4 (Court, Moss).

## LAW REGARDING THE SENTENCING GUIDELINES

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court of the United States of America severed the mandatory provisions from the Sentencing Reform Act, Pub. L No. 98-473, 98 Stat. 1837, 1987, thus making the Guidelines sentencing ranges effectively advisory.  In excising the two sections, the Supreme Court left the remainder of the Sentencing Reform Act intact, including 18 U.S.C. § 3553: "Section 3553(a) remains in effect, and sets forth numerous factors that guide sentencing.  Those factors in turn will guide appellate courts, as they have in the past, in determining whether a sentence is unreasonable."  United States v. Booker, 543 U.S. at 261.

Congress has directed sentencing courts to impose a sentence "sufficient, but not greater than necessary," to comply with the four statutorily defined purposes that 18 U.S.C. § 3553(a)(2) enumerates:

> (A)      to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B)      to afford adequate deterrence to criminal conduct;
>
> (C)      to protect the public from further crimes of the defendant; and
>
> (D)      to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner . . . .

18 U.S.C. § 3553(a)(2).

[A] defendant who has been found guilty of an offense described in any Federal statute . . . shall be sentenced in accordance with the provisions of this chapter so

- 18 -

> as to achieve the purposes set forth in subparagraphs (A) through (D) of section 3553(a)(2) to the extent that they are applicable in light of all the circumstances of the case.

18 U.S.C. § 3551(a).  To achieve these purposes, § 3553(a) directs sentencing courts to consider: (i) the Guidelines; (ii) the offense's nature, and the nature of the defendant's character; (iii) the available sentences; (iv) the policy favoring uniformity in sentences for defendants who commit similar crimes; (v) the need to provide restitution to victims; and (vi) any pertinent United States Sentencing Commission policy statements in effect on the date of sentencing.  See 18 U.S.C. § 3553(a)(1), (3)-(7).

Although the Guidelines sentences are no longer mandatory, both the Supreme Court and the Tenth Circuit have clarified that, while the Guidelines are one of several factors which § 3553(a) enumerates, they are entitled to careful consideration.  See Rita v. United States, 551 U.S. 338, 349 (2007)("The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate."); United States v. Cage, 451 F.3d 585, 593 (10th Cir. 2006)(describing the Guidelines as more than "just one factor among many"), overruled on other grounds by Gall v. United States, 552 U.S. 35 (2007).  The Guidelines are significant, because "the Guidelines are an expression of popular political will about sentencing that is entitled to due consideration . . . [and] 'represent at this point eighteen years' worth of careful consideration of the proper sentence for federal offenses.'"  United States v. Cage, 451 F.3d at 593 (quoting United States v. Terrell, 445 F.3d 1261, 1265 (10th Cir. 2006), overruled on other grounds by Rita v. United States, 551 U.S. at 349). A reasonable sentence is one that "avoid[s] unwarranted sentence disparities among defendants

with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6).  See

United States v. Booker, 543 U.S. at 261-62.

Finally, the Tenth Circuit has "joined a number of other circuits in holding that a sentence

within the applicable Guidelines range is presumptively reasonable." United States v. Terrell, 445

F.3d at 1264.  This presumption is an appellate presumption, however, and not one that the trial

court can or should apply.  See Kimbrough v. United States, 552 U.S. 85, 90-91 (2007); Gall v.

United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 350-51 (repeating that the

presumption of reasonableness "is an *appellate* court presumption")(emphasis in original).

Instead, the trial court must undertake the § 3553(a) balancing of factors without any presumption

in favor of the advisory Guidelines sentence.  See Kimbrough v. United States, 552 U.S. at 90-91;

Gall v. United States, 552 U.S. at 46-47; Rita v. United States, 551 U.S. at 351.

### LAW REGARDING SUPERVISED RELEASE REVOCATION AND REVOCATION HEARINGS

Subsection (e)(3) of § 3583 of Title 18 of the United States Code permits courts to revoke

supervised release after concluding that the defendant violated a condition of probation by a

preponderance of the evidence.  See 18 U.S.C. § 3583(e).  Section 3583(e)(3) sets forth the process

for revoking supervised release:

> (e)  **Modification of conditions or revocation**. -- The court may, after considering the factors set forth in section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) --
>
> . . .
>
> > (3)  revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute for the offense that resulted in such term of supervised release without credit for time previously served on postrelease supervision, if the court, pursuant to the Federal Rules of Criminal Procedure applicable to revocation of probation

> or supervised release, finds by a preponderance of the evidence that
> the defendant violated a condition of supervised release, except that
> a defendant whose term is revoked under this paragraph may not be
> required to serve on any such revocation more than 5 years in prison
> if the offense that resulted in the term of supervised release is a class
> A felony, more than 3 years in prison if such offense is a class B
> felony, more than 2 years in prison if such offense is a class C or D
> felony, or more than one year in any other case . . . .

18 U.S.C. § 3583(e) (bold in original).  "Preponderance of the evidence" means:

> The greater weight of the evidence, not necessarily established by the greater
> number of witnesses testifying to a fact but by evidence that has the most
> convincing force; superior evidentiary weight that, though not sufficient to free the
> mind wholly from all reasonable doubt, is still sufficient to incline a fair and
> impartial mind to one side of the issue rather than the other.

"Preponderance of the Evidence," Black's Law Dictionary (11th ed. 2019).  See 10th Cir. Pattern Jury Instruction 1.05.1 ("Preponderance of evidence is evidence sufficient to persuade you that a fact is more likely present than not present").

"The Sixth Amendment [to the Constitution of the United States of America] is a trial right" and does not apply to revocation hearings.  United States v. Hernandez, 778 F. Supp. 2d 1211, 1225 (D.N.M. 2011)(Browning, J.).  Rule 32.1 of the Federal Rules of Criminal Procedure, however, gives the defendant at the revocation hearing "an opportunity to appear, present evidence, and question any adverse witness unless the court determines that the interest of justice does not require the witness to appear."  Fed. R. Crim. P. 32.1(b)(2)(c).  The rule's notes instruct courts to apply a balancing test that weighs "the person's interest in the constitutionally guaranteed right to confrontation against the government's good cause for denying it."  Rule 32.1 Advisory Committee's Note to the 2012 Amendment.  The Tenth Circuit has adopted this balancing test "when determining a releasee's confrontation rights at a revocation hearing."  Jones, 818 F.3d at 1099.  See United States v. Hernandez, 428 F. Supp. 3d at 788 ("When applying the balancing test,

the Court must weigh the defendant's interest in cross-examining and confronting [a] witness with the government's good cause for not presenting the witness" (citing Jones, 818 F.3d at 1098)).

## ANALYSIS

A preponderance of the evidence indicates that Hykes used or possessed alcohol, which is a Grade C violation. The Court concludes, however, that it cannot find, by a preponderance of the reliable evidence, that Hykes violated a state, federal, or local law by sexually assaulting Doe on November 28, 2021. Accordingly, with a Grade C violation and a criminal history category of II, the Guidelines establish a revocation imprisonment range of 4 to 10 months.

In arriving at this conclusion, the Court determines that it will not rely on Doe's out-of-court statements, because the United States has not demonstrated good cause for not calling Doe at any of the revocation hearings. Next, without considering those out-of-court statements, the Court determines that a preponderance of the evidence does not support a finding that Hykes sexually assaulted Doe on November 28, 2021. Finally, the Court determines that a preponderance of the evidence supports a finding that Hykes used or possessed alcohol and, therefore, violated his supervised release special condition.

I. **THE COURT WILL NOT RELY UPON DOE'S OUT-OF-COURT STATEMENTS IN DETERMINING WHETHER HYKES VIOLATED HIS SUPERVISED RELEASE CONDITIONS.**

The Tenth Circuit applies the Jones test where the United States relies on out-of-court testimony from a non-testifying declarant at a revocation hearing. See Jones, 818 F.3d at 1097-98. The test requires the Court to "balanc[e] (1) 'the [defendant]'s interest in the constitutionally guaranteed right to confrontation' against (2) 'the government's good cause for denying it.'" Jones, 818 F.3d at 1100 (quoting Advisory Committee's Note to the 2002 Amendment to Fed. R. Crim. P. 32.1). Courts have concluded that the United States has good cause not to call a witness

where the United States has offered a variety of justifications for a witness' absence.  For example,

courts have concluded that the United States has good cause not to call a witness where: (i) the

witness is afraid of the defendant, see United States v. Rondeau, 430 F.3d 44, 49 (1st Cir. 2005);

(ii) the United States does not want to revictimize the witness, see United States v. Peguero,

34 F.4th 143, 155 (2d Cir. 2022); or (iii) the United States cannot locate a witness, United States

v. Hall, 419 F.3d 980, 988 (9th Cir. 2005).[9]  Here, the United States offers three rationalizations

for its decision not to call Doe: (i) Doe is afraid of testifying against Hykes, see November 14 Tr.

at 21:22-22:4 (Court, Hurtado); (ii) the United States does not want to retraumatize Doe by having

her testify, see April 19 Tr. at 49:11-19 (Hurtado); and (iii) the United States does not want to

complicate the parallel prosecution in State court, see April 19 Tr. at 49:20-24 (Hurtado).  The

Court concludes that, based on the evidence before it in the record, none of these three reasons

amount to good cause under Jones.  See Jones, 818 F.3d at 1100.

### A.   DOE'S PURPORTED FEAR OF TESTIFYING AGAINST HYKES DOES NOT AMOUNT TO GOOD CAUSE.

First, that the United States' unsupported assertion that Doe is afraid of testifying against

Hykes does not constitute good cause not to call her as a witness at the revocation hearings.  See

Jones, 818 F.3d at 1100.  Other courts have determined that fear can amount to good cause.  See,

---

[9]The other circuit courts do not use the Jones test.  They do, however, use balancing tests that are analogous to Jones test when determining whether to rely on out-of-court statements by non-testifying declarants that are offered against the defendant in a revocation hearing.  See United States v. Taveras, 380 F.3d 532, 536 (1st Cir. 2004); United States v. Chin, 224 F.3d 121, 124 (2d Cir. 2000); United States v. Lloyd, 566 F.3d 341, 344 (3d Cir. 2009); United States v. Doswell, 670 F.3d 526, 530 (4th Cir. 2012); Barnes v. Johnson, 184 F.3d 451, 454 (5th Cir. 1999); United States v. Jackson, 422 Fed. App'x 408, 410-11 (6th Cir. 2011)(unpublished); United States v. Jordan, 742 F.3d 276, 279 (7th Cir. 2014); United States v. Bell, 785 F.2d 640, 642 (8th Cir. 1986); United States v. Comito, 177 F.3d 1166, 1170 (9th Cir. 1999); United States v. Frazier, 26 F.3d 110, 114 (11th Cir. 1994); United States v. Stanfield, 360 F.3d 1346, 1360 (D.C. Cir. 2004).

e.g., United States v. Rondeau, 430 F.3d at 49; United States v. Peguero, 34 F.4th at 155; United States v. Alvear, 959 F.3d 185, 190 (5th Cir. 2020).  In those cases, the evidence of fear was well substantiated in the record.  See United States v. Alvear, 959 F.3d at 190 (concluding that there was "ample record evidence justifying an inference that [the witness] was too afraid to testify" where the witness had demonstrated a history of fearing the defendant).

The Court recently confronted a fear-based justification in United States v. Calvert-Cata, No. CR 16-4566 JB, 2022 WL 14813473 (D.N.M. October 26, 2022)(Browning, J.)("Calvert-Cata").  In Calvert-Cata, Calvert-Cata was out of custody on supervised release when the USPO alleged that he violated his supervised release conditions by kidnapping and battering his girlfriend.  2022 WL 14813473, at *6.  Calvert-Cata denied the allegations, and the Court held two evidentiary revocation hearings.  See 2022 WL 14813473, at *6-7.  The United States declined to call Calvert-Cata's girlfriend at either revocation hearing, but relied heavily on her out-of-court statements.  See 2022 WL 14813473, at *7.  The United States offered three justifications for its decision not to call the girlfriend: (i) she was afraid of Calvert-Cata; (ii) the United States did not want to retraumatize her by having her testify; and (iii) the United States did not want to complicate the parallel proceeding in State court.  See 2022 WL 14813473, at *21.  The Court applied the Jones balancing test[10] and rejected all three justifications.  See 2022 WL 14813473, at *21.  With

_____

[10]The Court's analysis in Calvert-Cata proceeds in three steps.  See 2022 WL 14813473, at *12.  First, it bypasses the Jones test, because the out-of-court statements at issue would have been admissible under the Federal Rules of Evidence and Crawford v. Washington, 541 U.S. 36 (2004)("Crawford").  See 2022 WL 14813473, at *12-19.  Second, it applies the Jones framework and concludes that admissibility under the Federal Rules of Evidence and Crawford is good cause under Jones.  See 2022 WL 14813473, at *19-20.  Third, it conducts a straightforward Jones analysis and excludes all of the victim's out-of-court statements.  See 2022 WL 14813473, at *20-23.  Calvert-Cata's first two steps are not applicable here, because Doe's statements are testimonial statements to law enforcement and are therefore inadmissible under Crawford.  See Crawford, 541 U.S. at 53.  Instead, the Court draws on Calvert-Cata's third step here.

respect to the fear-based justification, the Court acknowledged that "fear can amount to good cause in certain cases."  2022 WL 14813473, at *21 (citing United States v. Rondeau, 430 F.3d at 49; United States v. Peguero, 34 F.4th at 155; United States v. Alvear, 959 F.3d at 190).  Nevertheless, the Court determined that, while the Court took the United States "at [its] word" that the girlfriend was afraid of testifying against Calvert-Cata, the Court needed more evidence of that fear.  2022 WL 14813473, at *21.  "[T]he Court thinks that there should be an affidavit or a declaration addressing [the girlfriend's] fear so it can judge [her] degree of fear itself."  2022 WL 14813473, at *21.

The Court's analysis on the United States' fear justification from Calvert-Cata applies here.  Like it did in Calvert-Cata, the United States asserts that it decided not to call Doe, because she is afraid of Hykes.  See November 14 Tr. at 21:22-22:4 (Court, Hurtado); 2022 WL 14813473, at *21.  Also like in Calvert-Cata, the United States has not offered any support for its contention that the alleged victim is afraid of the defendant.  See 2022 WL 14813473, at *21.  The Court does not doubt that Doe is afraid of testifying against Hykes.[11]  Nevertheless, the Court determines, as it does in Calvert-Cata, that it needs more evidence of the victim's alleged fear in order to weigh it against Hykes' interest in confronting his accuser.  See 2022 WL 14813473, at *21.  The United States cannot rely on its bare assertion that Doe is afraid of Hykes to show good cause under Jones.

---

[11]See Robert H. Pantell, *The Child Witness in the Courtroom*, 139 Pediatrics 1, 4 (2017)("Studies have established clearly that children experience anxiety surrounding court appearances and that the main fear is facing the defendant.  Other fears include being hurt by the defendant, embarrassment about crying or not being able to answer questions, and going to jail"); Debra Whitcomb, Elizabeth R. Shapiro & Lindsey D. Stellwagen, Esq., When the Victim Is a Child: Issues for Judges and Prosecutors 17-18 (1985)("The most frequently mentioned fear was facing the defendant.  That experience is frightening for most adults, but to a child who does not understand the reason for confrontation, the anticipation and experience of being in close proximity to the defendant can be overwhelming.").

See Jones, 818 F.3d at 1100.  The Court cannot engage in an interest balancing test without more information about the United States' stated interest.

The Court is more willing to rely on a larger universe of evidence which shows that Doe is afraid of testifying against Hykes than it was in Calvert-Cata because Doe is a child victim, and the victim in Calvert-Cata was not a child.  In Calvert-Cata, "the Court [thought] that there should be an affidavit or a declaration addressing [the girlfriend's] fear so it [could] judge [her] degree of fear itself."  2022 WL 14813473, at *21.  The same is true here, but the Court may be willing to rely on evidence other than an affidavit or declaration, because of the sensitivities involved with engaging children in the criminal justice system.[12]  For example, the Court might accept testimony from one of the law enforcement officers or medical professionals who interviewed or examined Doe explaining Doe's fear.  It might also accept a declaration, affidavit, or testimony from Doe's parent explaining Doe's fear.  Ultimately, the Court does not doubt that a minor victim of sexual assault would have a credible fear of testifying against their alleged assailant at a revocation hearing.  Yet, the Court does not, on the record before it, have evidence that would allow it to assess Doe's degree of fear in this case.  In the end, the Court is unwilling to rely on speculation or conclusory assertions alone.  If the United States asserts a fear-based justification under Jones, it must substantiate that claim with evidence; a bare allegation that the victim is afraid is not sufficient.  See Jones, 818 F.3d at 1100.  For these reasons, the Court concludes that Doe's alleged fear of Hykes does not amount to good cause under Jones.  See Jones, 818 F.3d at 1100.

---

[12]Debra Whitcomb, Elizabeth R. Shapiro & Lindsey D. Stellwagen, Esq., When The Victim Is a Child: Issues for Judges and Prosecutors 13-20 (1985)(describing the unique "problems" that arise when minor victims of violent or sexual crimes "are called upon to participate in criminal proceedings," all stemming from their "immaturity with regard to physical, cognitive, and emotional development").

**B.   THE UNITED STATES' INTEREST IN NOT RETRAUMATIZING DOE DOES NOT AMOUNT TO GOOD CAUSE.**

Similarly, the United States' stated interest in not retraumatizing Doe does not amount to good cause.  See Jones, 818 F.3d at 1100.  Like fear, the risk of retraumatization can provide the basis for good cause under Jones.  See United States v. Peguero, 34 F.4th at 155-56.  Yet, like when considering fear, the record must provide evidence to support a finding that there is a risk of retraumatization.  See United States v. Peguero, 34 F.4th at 156 (concluding that the risk of retraumatization is good cause in an intimate-partner-violence case where the witness could show that the defendant's violence caused her to have seizures and anxiety, and that she was afraid that testifying would retrigger those health issues).

The Court recently confronted a retraumatization justification in Calvert-Cata.  See 2022 WL 14813473, at *21.  There, the Court acknowledged that it "[did] not doubt" that the alleged kidnapping and battery traumatized the victim.  2022 WL 14813473, at *21.  The Court determined, however, that "the United States ha[d] not offered any evidence to substantiate its contention that calling [the victim] as a witness would retraumatize her."  2022 WL 14813473, at *21.  "The Court [was] left to speculate whether testifying would have a detrimental impact on [the victim.]"  2022 WL 14813473, at *21.  The Court also noted that it was particularly skeptical of accepting the retraumatization justification in Calvert-Cata because the victim was going to have to testify in the parallel State proceeding.  See 2022 WL 14813473, at *21.  The Court did not see why it should excuse the victim's absence at the revocation hearing on the grounds that testifying would retraumatize her, when she would have to "tell her story in the State proceeding" at least twice, once in discovery and once at trial.  2022 WL 14813473, at *21 (citing N.M. Code.

R. § 5-503(A), which establishes that "[a]ny person, other than the defendant, with information which is subject to discovery shall give a statement").

Like in Calvert-Cata, the United States here has not offered any evidence to substantiate its contention that calling Doe as a witness at the revocation hearing would retraumatize her. Like in Calvert-Cata, the Court "does not doubt" that the alleged events of November 28, 2021, would have traumatized Doe. 2022 WL 14813473, at *21. Also like in Calvert-Cata, the Court is unwilling to speculate whether having Doe testify at one of the revocation hearings would retraumatize her. See 2022 WL 14813473, at *21. Although it is well documented that requiring a child victim to testify can retraumatize the child,[13] the United States has not demonstrated that will be the case here. The United States must substantiate its allegation that having Doe testify would retraumatize her. For example, the United States could offer a declaration or affidavit from Doe that explains that thinking or speaking about the events of November 28, 2021, cause her great emotional or physical pain. Alternatively, it could present expert testimony about traumatization, retraumatization of minor victims of violent or sexual crimes, and the risk of retraumatizing Doe in this case.

The need for evidentiary support is especially pressing here, because Doe has already had to tell her story at least five times -- twice to investigators at the McGrane Center on December 2, 2021, see March 28 Tr. at 34:13-24 (Daugherty); id. at 29:24-30:2 (Daugherty), once at the All

---

[13]See Robert H. Pantell, *The Child Witness in the Courtroom*, 139 Pediatrics 1, 4 (2017)(describing that having a child victim testify "was associated with worse mental health outcomes, and testifying about severe abuse had higher levels of trauma related problems"); Debra Whitcomb, Elizabeth R. Shapiro & Lindsey D. Stellwagen, Esq., When The Victim Is a Child: Issues for Judges and Prosecutors 18 (1985)("Having to repeat their stories so many times was also reported to be difficult and confusing to children . . . While this is simply exasperating for some children, it causes others to relive the traumatic event repeatedly.").

Faiths Child Advocacy Center, see March 28 Tr. at 37:5-8 (Daugherty), once for Daugherty on January 13, 2022, March 28 Tr. at 46:6-7 (Daugherty), and once for Defense counsel, see November 14 Tr. at 25:20-26:4 (Court, Moss) -- and will have to tell her story again at the State trial.  Studies have shown that having a child victim testify multiple times can be more detrimental to the child's mental and physical well-being than having the child victim testify once.[14]  The United States has not demonstrated, however, that will occur here.  The Court cannot discern whether Doe will be worse off for having to tell her story six times -- including at the revocation hearing -- than she would be if she only had to tell her story five times.  For these reasons, the Court concludes that the United States' interest in not retraumatizing Doe does not amount to good cause under Jones.  See Jones, 818 F.3d at 1100.

### C.   THE UNITED STATES' DESIRE NOT TO COMPLICATE THE PARALLEL STATE PROCEEDING DOES NOT AMOUNT TO GOOD CAUSE.

Finally, the United States' interest in not complicating the State court proceeding does not amount to good cause.  See Jones, 818 F.3d at 1100.  The Court confronted a similar proposed justification in Calvert-Cata.  See 2022 WL 14813473, at *21.  There, the United States asserted that it did not call the victim as a witness at the revocation hearing, because it did not want to complicate the parallel State prosecution.  See 2022 WL 14813473, at *22.  The Court rejected that justification.  See 2022 WL 14813473, at *21.  The Court explained:

---

[14]See Robert H. Pantell, *The Child Witness in the Courtroom*, 139 Pediatrics 1, 4 (2017)("Postponements cause emotional difficulties, and having to testify more than once is associated with long-term mental health problems"); Debra Whitcomb, Elizabeth R. Shapiro & Lindsey D. Stellwagen, Esq., When The Victim Is a Child: Issues for Judges and Prosecutors 18 (1985)("Having to repeat their stories so many times was also reported to be difficult and confusing to children. Because they do not understand the different roles and obligations of all the people who interview them, children do not understand why they must tell their stories for police, social workers, doctors, prosecutors, and, ultimately, the court.").

It seems that the United States and the State do not want Calvert-Cata's defense counsel in the State proceeding to have the transcript of [the victim's] testimony in a federal revocation hearing to use for cross examining her in the State trial. While that concern is valid, that concern does not justify not having her testify here. If the Court were to accept that rationale, it would excuse practically every victim in every revocation proceeding. Further, accepting that rationale would infringe on Calvert-Cata's rule 32.1 confrontation rights here, and his confrontation rights in the State proceeding.

2022 WL 14813473, at *22.

The Court's analysis from Calvert-Cata applies here. The Court understands why, as a matter of strategy, the United States does not want Hykes' defense counsel to have a transcript of Doe's testimony at a revocation hearing to use in cross examining Doe in the State proceeding. Nevertheless, the Court does not think that strategy choice justifies not calling Doe to testify at the revocation hearings. Here, the United States carries the burden to prove by a preponderance of the evidence that Hykes violated a supervised release condition. See United States v. Barela, 807 F. App'x 797, 800 (10th Cir. 2020)(citing Johnson v. United States, 529 U.S. 694, 700 (2000)). At the trial, the State will carry the burden of proving beyond a reasonable doubt that Hykes sexually assaulted Doe. See N.M.R. Ann. Crim. UJI 14-5060 ("The burden is always on the state to prove guilt beyond a reasonable doubt."). The United States cannot shirk its responsibility to prove its case here in an effort to make the State's job to prove its own case a little bit easier down the line. To permit otherwise would infringe on Hykes' right to confrontation here and in the State proceeding. For these reasons, the Court concludes that the risk of complicating the State proceeding does not amount to good cause.

II.    **A PREPONDERANCE OF THE EVIDENCE DOES NOT SUPPORT THE CONCLUSION THAT HYKES VIOLATED HIS SUPERVISED RELEASE CONDITION BY VIOLATING STATE LAW.**

Having determined that it will not rely on Doe's out-of-court statements, the Court concludes that a preponderance of the evidence does not support a finding that Hykes violated State law.  The Petition alleges that Hykes violated four State laws by: (i) sexually penetrating a minor, in violation of N.M.S.A. § 30-9-11(D)(1); (ii) sexually contacting a minor, in violation of N.M.S.A. § 30-9-13(B)(2)(a); (iii) intimidating a witness, in violation of N.M.S.A. § 30-24-3(A)(3); and (iv) abusing a child, in violation of N.M.S.A. § 30-6-1(D)(1).  The Court takes each alleged crime in turn and determines that there is insufficient evidence to support a finding by a preponderance of the evidence that Hykes violated State law.

A.    **A PREPONDERANCE OF THE EVIDENCE DOES NOT SUPPORT A FINDING THAT HYKES SEXUALLY PENETRATED A MINOR, IN VIOLATION OF N.M.S.A. § 30-9-11(D)(1).**

N.M.S.A. § 30-9-11 provides in relevant part:

A.    Criminal sexual penetration is the unlawful and intentional causing of a person to engage in sexual intercourse, cunnilingus, fellatio or anal intercourse or the causing of penetration, to any extent and with any object, of the genital or anal openings of another, whether or not there is any emission . . . .

D.    Criminal sexual penetration in the first degree consists of all criminal sexual penetration perpetrated

(1)    on a child under thirteen years of age . . . .

N.M.S.A. § 30-9-11.

Here, there is insufficient evidence to find by a preponderance of the evidence that Hykes criminally sexually penetrated Doe.  The evidence suggests that it is more likely than not that a male sexually penetrated Doe sometime before her SANE examination on December 2, 2021.

- 31 -

During her SANE evaluation, Doe had "abrasions in her vaginal area and tearing to her anus." March 28 Tr. at 35:16-17 (Daugherty). Further, the DNA testing indicates that male DNA was found in Doe's mons pubis/outer labia majora swab and neck swab. See First Report at 1. Nevertheless, there is insufficient evidence on the record to support a finding that Hykes was the male who sexually penetrated Doe. The initial DNA testing that Byrdsong conducted merely indicates that there was male DNA identified in Doe's mons pubis/outer labia majora swab and neck swab, see First Report at 1, but it does not identify which male. Importantly, the subsequent Y-STR testing eliminated Hykes as a potential source of the male DNA found in the mons pubis/outer labia majora swab. See Second Report at 2. In light of those Y-STR results, the Court concludes that it is more likely than not that Hykes did not sexually penetrate Doe sometime before her SANE evaluation. The Court also notes that Doe was fifteen at the time of the alleged offense. See Petition at 1-2. Accordingly, the Court finds that the United States would be unable to prove that Hykes penetrated "a child under thirteen years of age," as is necessary to prove a violation of N.M.S.A. § 30-9-11(D)(1). For these reasons, the Court concludes that a preponderance of the evidence does not support a finding that Hykes sexually penetrated Doe.

**B.     A PREPONDERANCE OF THE EVIDENCE DOES NOT SUPPORT A FINDING THAT HYKES SEXUALLY CONTACTED A MINOR, IN VIOLATION OF N.M.S.A. § 30-9-13(B)(2)(A).**

N.M.S.A. § 30-9-13 provides in relevant part:

A.     Criminal sexual contact of a minor is the unlawful and intentional touching of or applying force to the intimate parts of a minor or the unlawful and intentional causing of a minor to touch one's intimate parts. For the purposes of this section, "intimate parts" means the primary genital area, groin, buttocks, anus or breast.

B.     Criminal sexual contact of a minor in the second degree consists of all criminal sexual contact of the unclothed intimate parts of a minor perpetrated . . .

(2)  on a child thirteen to eighteen years of age when:

　　(a)  the perpetrator is in a position of authority over the child and uses that authority to coerce the child to submit  . . . .

N.M.S.A. § 30-9-13.

Here, there is insufficient evidence to support a finding by a preponderance of the evidence that Hykes criminally made sexual contact with Doe.  The reasoning that the Court lays out above regarding the alleged N.M.S.A. § 30-9-11 violation applies to the alleged N.M.S.A. § 30-9-13 violation as well: the United States has shown, by a preponderance of the evidence, that a male sexually touched Doe, but not that the male was Hykes.  During her SANE evaluation, Doe had "abrasions in her vaginal area and tearing to her anus."  March 28 Tr. at 35:16-17 (Daugherty).  She also had "bruising in the area of her neck, close to the areas of her breasts, and around the buttocks and thigh."  March 28 Tr. at 35:22-24 (Daugherty).  The DNA testing later indicated that male DNA was found in Doe's mons pubis/outer labia majora swab and neck swab.  See First Report at 1.  The Court finds by a preponderance of the evidence that someone "intentional[ly] touch[ed] . . . or appl[ied] force to . . . [Doe's] intimate parts," in violation of N.M.S.A. § 30-9-13, but it cannot find by a preponderance of the evidence, on the record before it, that the person was Hykes.  For these reasons, the Court concludes that a preponderance of the evidence does not support a finding that Hykes violated N.M.S.A. § 30-9-13.

**C.  A PREPONDERANCE OF THE EVIDENCE DOES NOT SUPPORT A FINDING THAT HYKES INTIMIDATED A WITNESS, IN VIOLATION OF N.M.S.A. § 30-24-3(A)(3).**

N.M.S.A. § 30-24-3 provides in relevant part:

A.  Bribery or intimidation of a witness consists of any person knowingly . . .

(3)     intimidating or threatening any person or giving or offering to give anything of value to any person with the intent to keep the person from truthfully reporting to a law enforcement officer or any agency of government that is responsible for enforcing criminal laws information relating to the commission or possible commission of a felony offense or a violation of conditions of probation, parole or release pending judicial proceedings.

N.M.S.A. § 30-24-3.

Here, the Petition alleges that Hykes "sexually penetrated [Doe] vaginally, anally, and orally at his residence.  He then told her not to tell anyone or he would be killed."  Petition at 1. A preponderance of the evidence on the record does not support those allegations.  As explained in greater detail above, a preponderance of the evidence does not support a finding that Hykes sexually assaulted Doe.  The evidence on the record also does not support a finding that Hykes intimidated, threatened, or bribed Doe after allegedly sexually assaulting her.  Further, there are no facts that indicate that Hykes intimidated, threatened, or bribed any other witness in an effort to keep them from assisting the officers investigating Doe's allegations.  See N.M.S.A. § 30-24-3.

To the contrary, the evidence on the record suggests that Hykes was cooperative throughout the investigation into Doe's allegations.  For example, Hykes promptly drove from Albuquerque to Tijeras when he heard law enforcement was at his ranch on January 13, 2022. See April 19 Tr. at 3-4 (Coburn).  He also spoke with Daugherty at the scene of the investigation of his ranch, see April 19 Tr. at 35:18-22 (Coburn), and again after being arrested later that day. See March 28 Tr. at 50:6-9 (Daugherty, Hurtado).  The Court thinks that it is unlikely that a suspect like Hykes would cooperate in certain aspects of the investigation, but also attempt to intimidate a witness that would have been helpful to that same investigation.

- 34 -

Finally, even if there was evidence on the record to support a finding that Hykes "told [Doe] not to tell anyone [about the sexual assault] or he would be killed," Petition at 1, the Court is not convinced that statement would amount to a threatening or intimidating statement within the meaning of § 30-24-3.  New Mexico State courts have found violations of § 30-24-3 where a defendant has threatened to kill a victim if the victim speaks to authorities.  State v. Vigil, 2021-NMCA-024, ¶ 4, 489 P.3d 974, 978 (affirming the defendant's § 30-24-3 conviction after he threatened to kill his girlfriend for "ratting him out" to the police).  The Court has not identified any cases where a State court found a violation of § 30-24-3 where a defendant has asserted to a victim that he himself would be killed if the victim speaks to authorities.  It is not evident to the Court that type of statement would amount to a threatening or intimidating statement within the meaning of § 30-24-3.  For these reasons, the Court concludes that a preponderance of the evidence does not support a finding that Hykes intimidated a witness, in violation of N.M.S.A. § 30-24-3.

**D.      A PREPONDERANCE OF THE EVIDENCE DOES NOT SUPPORT A FINDING THAT HYKES ABUSED A CHILD, IN VIOLATION OF N.M.S.A. § 30-6-1(D)(1).**

N.M.S.A. § 30-6-1 provides in relevant part:

> D.      Abuse of a child consists of a person knowingly, intentionally or negligently, and without justifiable cause, causing or permitting a child to be:
>
>> (1)      placed in a situation that may endanger the child's life or health . . . .

N.M.S.A. § 30-6-1.

Here, a preponderance of the evidence does not support a finding that Hykes abused Doe. A preponderance of the evidence on the record does not support a finding that Hykes placed Doe in a situation that may endanger her life or health.  See N.M.S.A. § 30-6-1.  To the contrary, the

testimony presented at the revocation hearings suggests that Hykes tried to prevent Doe from being in a situation that might endanger her life or health.  After Doe, Howard, and Cropsey left Hykes' ranch on November 27, 2021, Coburn, Zinck, and Hykes had a conversation in which they all agreed that they were "concerned" about Doe, April 19 Tr. at 30:14 (Coburn), because they thought that "something very upsetting [was] going on with [her.]"  March 28 Tr. at 68:1-2 (Zinck). Accordingly, they made "a plan to see what [they] could do to ensure the safety of Ms. Jane Doe." April 19 Tr. at 29:20-21 (Coburn).  They called several friends to see if the friends could take Doe in and eventually called Howard and Cropsey to ask them to bring Doe back to Hykes' ranch.  See April 19 Tr. at 30:5-17 (Coburn).  That testimony supports a finding that Hykes wanted Doe to be in a safe situation, and not that he "knowingly, intentionally or negligently . . . placed [Doe] in a situation that may endanger [her] life or health."  N.M.S.A. § 30-6-1.

If anything, the evidence on the record supports a finding that Doe was happy and healthy while in Hykes' care on November 28th, 2021.  Zinck testified that on Saturday, November 27, Doe appeared "very tired" and "frustrated with her mom."  March 28 Tr. at 64:23-25 (Zinck). Zinck also testified that at one point Doe looked "very upset and distressed . . . like [she was] choking back tears," after Howard had yelled and cursed at Doe.  March 28 Tr. at 64:25-65:14 (Zinck).  By contrast, Zinck testified that on Sunday, November 28, Doe's demeanor was "completely different" after spending the night at Hykes' ranch.  March 28 Tr. at 71:10-13 (Zinck). Zinck observed that Doe was "very relaxed and . . . smiling."  March 28 Tr. at 71:10-13 (Zinck). Zinck's observations support a finding that Doe was safe and happy in Hykes' care.  For these reasons, the Court concludes that a preponderance of the evidence does not support a finding that Hykes abused a child, in violation of N.M.S.A. § 30-6-1.

### III. A PREPONDERANCE OF THE EVIDENCE SUPPORTS THE CONCLUSION THAT HYKES VIOLATED HIS SUPERVISED RELEASE SPECIAL CONDITION BY POSSESSING ALCOHOL.

Finally, the Court concludes that a preponderance of the evidence supports a finding that Hykes possessed alcohol, in violation of his supervised release special condition. Possession is:

> The detention and control, or the manual or ideal custody, of anything which may be the subject of property, for one's use and enjoyment, either as owner or as the proprietor of a qualified right in it, and either held personally or by another who exercises it in one's place and name.

Possession, Black's Law Dictionary (11th ed. 2019). Possession does not require actual physical control; instead it is a "condition of facts under which one can exercise his power over a corporeal thing at his pleasure to the exclusion of all other persons." Possession, Black's Law Dictionary (11th ed. 2019). See 10th Cir. Pattern Jury Instruction 1.31 (distinguishing between actual and constructive possession).

Here, a preponderance of the evidence supports a finding that Hykes used or possessed alcohol in violation of his supervised release special condition. The Court has two independent bases for its finding that Hykes used or possessed alcohol. First, Hykes confessed to Daugherty that he drank alcohol the morning of January 13, 2022. Daugherty testified that during his January 13, 2022, interview with Hykes, he smelled alcohol on Hykes' breath. March 28 Tr. at 51:25-52:2 (Daugherty). Daugherty testified that he asked Hykes about the smell on Hykes' breath, and that Hykes admitted to drinking alcohol that morning. See March 28 Tr. at 51:25-52:4 (Daugherty). In light of Daugherty's observations and Hykes' confession, the Court finds that it is more likely than not that Hykes consumed alcohol on January 13, 2022.

Second, and separately, when law enforcement searched Hykes' home on January 13, 2022, they recovered, among other things, "an empty vodka bottle" in a trashcan near his trailer.

- 37 -

March 28 Tr. at 48:2-3 (Daugherty).  The bottle supports a finding that Hykes possessed alcohol. Although Hykes was not physically holding the bottle when the detective recovered it, the bottle was in Hykes' trashcan, next to Hykes' trailer, on Hykes' property.  He was able to "exercise his power over [the vodka bottle] at his pleasure to the exclusion of all other persons," Possession, Black's Law Dictionary (11th ed. 2019), and therefore possessed the vodka bottle.

       Hykes' attempt to explain away the vodka bottle's presence in his trashcan is unpersuasive. At the revocation hearing, Hykes' witnesses suggested that Hykes did not possess the vodka bottle because it could have blown onto his property. Coburn testified that "it's very windy" at Hykes' ranch, April 19 Tr. at 37:2 (Coburn), and that she has to pick up trash which blows onto the property and often finds "a myriad of random items . . . [like] rubber gloves and a Cheetos bag." April 19 Tr. at 36:15-18 (Coburn).  She did not, however, claim that she had found the vodka bottle somewhere on the property and brought it to the trashcan.  Coburn also admitted that the ranch is in a rural area off a dirt road.  See April 19 Tr. at 36:21-23 (Coburn).  Although it is plausible that the vodka bottle could have blown onto the property in the wind, the Court does not think that is likely.  While rubber gloves and bags might blow onto the remote property with the New Mexico

wind,[15] it is unlikely that a vodka bottle would blow onto the property absent a tornado.[16] There were no tornadoes recorded near Tijeras in late December 2021 or early January 2022.[17]

Instead, it seems more likely that Hykes intentionally possessed -- if not used -- the vodka bottle that investigators found in his trashcan.  That Hykes purposefully possessed the vodka bottle seems especially likely in light of his subsequent confession to Daugherty that he had consumed alcohol on January 13, 2022, and the fact that Hykes has used or possessed alcohol at least twice before while on supervised release.  See Report on Offender Under Supervision No Court Action Recommended, filed May 13, 2020 (Doc. 83)(indicating that Hykes provided a positive breath alcohol sample); Report on Offender Under Supervision No Court Action Recommended, filed January 12, 2021 (Doc. 85)(indicating that Hykes provided a positive breath alcohol sample).  For these reasons, the Court concludes, by a preponderance of the evidence, that Hykes used or possessed alcohol, in violation of his supervised release special condition.

**IT IS ORDERED** that: (i) Plaintiff United States of America has not proven by a preponderance of the evidence that Defendant Grant Hykes violated State law; (ii) the United States has proven by a preponderance of the evidence that Hykes used or possessed alcohol; (iii) by

---

[15]See Climate in New Mexico, https://weather.nmsu.edu/climate/about/ (last visited November 29, 2022)(explaining that winds in New Mexico are "usually moderate," but that "relatively strong winds often accompany occasional frontal activity during late winter and spring months and sometimes occur just in advance of thunderstorms.").

[16]See Climate in New Mexico, https://weather.nmsu.edu/climate/about/ (last visited November 29, 2022)("Tornadoes are occasionally reported in New Mexico, most frequently during afternoon and early evening hours from May through August. There is an average of nine tornadoes a year, but damage has been light because most occur over open, sparsely populated country.").

[17]See Tornado Archive, https://data.lcsun-news.com/tornado-archive/ (select "New Mexico" and "2021" and "2022" from the drop-down menus)(last visited November 29, 2022).

using or possessing alcohol, Hykes violated his supervised release special condition; and (iv) the

United States Sentencing Guidelines establish a revocation imprisonment range of 4 to 10 months.

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Alexander M. M. Uballez
   United States Attorney
Samuel A. Hurtado
   Assistant United States Attorney
United State Attorney's Office
Albuquerque, New Mexico

　　　　*Attorneys for the Plaintiff*

Kari T Morrissey
Kari T. Morrissey, Attorney at Law
Albuquerque, New Mexico

-- and --

Nicole Moss
Law Office of Nicole W Moss
Albuquerque, New Mexico

　　　　*Attorneys for the Defendant*